IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CLEVE FOSTER,                          §
    Petitioner,                    §
VS.                                    §  CIVIL ACTION NO. 4:07-CV-210-Y
                                       §   (death-penalty Case)
NATHANIEL QUARTERMAN, Director,§
Texas Department of Criminal           §
Justice, Correctional                  §
Institutions Division,                 §
    Respondent.                    §


MEMORANDUM OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Cleve Foster, sentenced to death for capital murder,
petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254, contending that his conviction and sentence are unconstitu-
tional in several respects.  Respondent Nathaniel Quarterman ("the
State") filed a brief in response.  The Court denies Foster's petition
for a writ of habeas corpus.

I

*History of the Case*

Procedural History

A jury convicted Foster of the capital murder of Nyanuer "Mary"
Pal, and his punishment was assessed at death by lethal injection.
See *State v. Foster*, Cause No. 0839040A (Criminal District Court
Number 1, Tarrant County, Texas, February 12, 2004).  The case was
appealed to the Texas Court of Criminal Appeals, and that court
affirmed the conviction in an unpublished opinion. See *Foster v.*

1

*State*, AP-74,901(Tex. Crim. App. April 12, 2006), *cert. denied*, 127 S.Ct. 930 (2007).

Foster filed a state application for writ of habeas corpus on November 18, 2005. On September 14, 2006, the state habeas court issued an order adopting the State's proposed findings of fact and conclusions of law providing for the denial of relief based on the pleadings, the exhibits filed by the parties, and the court record. (State Habeas Transcript, vol. 2, p. 275.) The Court of Criminal Appeals denied relief in an unpublished written order adopting the trial court's findings of fact and conclusions of law. See *Ex parte Foster*, No. 65,799-01 (Tex. Crim. App. March 21, 2007), *cert. denied*, 128 S.Ct. 490 (2007). Foster filed his federal petition for writ of habeas corpus on March 20, 2008. The State filed an answer on May 27 and furnished the state-court records. Foster filed a reply brief on August 4.

<u>Evidence Presented at Trial</u>

The Texas Court of Criminal Appeals recited the following factual background from Foster's trial in its opinion on direct appeal:

> The evidence shows that appellant and Sheldon Ward were close friends and were regulars at a bar named Fat Albert's located in Fort Worth. On the night of February 13, 2002, appellant and Ward were at Fat Albert's when Nyanuer "Mary" Pal, who was also a regular at Fat Albert's, arrived there at around 9:00 or 10:00 p.m. The bartender testified that the three socialized and that toward closing time Ward and Mary engaged in what the bartender called suggestive "dirty dancing." The bartender testified that Ward had the most interaction with Mary during the evening and that at times he, but not appellant, behaved inappropriately towards her. When the bar closed at 2:00

2

a.m., appellant, Ward and Mary walked out together.  They talked in the parking lot for a few minutes.  Mary left in her car, followed closely by appellant and Ward in appellant's truck, which appellant was driving.  The bartender testified that appellant's truck was right on Mary's bumper, which the bartender thought was unusual.  Approximately eight hours later at around 10:00 a.m., Mary's nude body was discovered in a ditch "quite a ways off the road."  Mary had been shot in the head, and there was a wadded-up piece of bloody duct tape next to her body.  In the early morning hours of February 15th, Mary's unlocked car, with her cell phone sitting on the front seat, was found in the parking lot of the apartment complex where she lived.

Subsequent DNA testing established that semen containing appellant's DNA was found inside Mary's vagina and semen containing Ward's DNA was found inside her anus.  Ward could not be excluded as a minor contributor of semen found inside Mary's vagina.

*       *       *

Within a week of Mary's murder, the police investigation had focused on appellant and Ward primarily because the police learned that they were seen following Mary out of the Fat Albert's parking lot.  On the evening of February 21st, the police arrived at the motel where appellant and Ward shared a room (room 117) and spoke to appellant.  Ward was not there.  The police found various items soaking in a cleaning fluid in a cooler in the back of appellant's truck.  These items consisted of three pairs of shoes, bungee cords, black gloves, a bicycle pump, a hatchet, a sheathed knife, two slingshots, a trailer hitch, coat hangers, a brown strap, a bleach bottle, and a liquid detergent bottle.  The State's DNA expert testified at trial that items soaked in cleaning fluids containing bleach could make DNA recovery almost impossible.  Appellant also directed the police to a dresser drawer in the motel room that contained a gun that Ward had purchased from a pawn shop in August 2001.  DNA testing established that the blood and tissue on the gun was Mary's.  The police also found bloody clothes in Ward's car.  The blood on these clothes was Mary's.

Appellant went to the homicide office on February 21st to provide a DNA sample.  Appellant was not under arrest at this time.  Appellant spoke to Detective McCaskill at

the homicide office. McCaskill testified that appellant made several inconsistent statements during the February 21st interview. Appellant initially denied that Mary had been inside his truck, he later stated that she may have leaned inside it, and he ultimately stated that "they" went cruising but that "they" brought Mary back to her vehicle at Fat Albert's. McCaskill testified that he did not believe this latter statement about dropping Mary off at her vehicle at Fat Albert's after "they" went cruising because Mary's vehicle was found outside of her apartment. Appellant never admitted to having vaginal sex with Mary during four separate interviews with McCaskill.

The police also obtained DNA samples from Ward, apparently some time on the night of February 21st. The next day, Ward decided to move from the motel room that he shared with appellant. Duane Thomas testified, as a rebuttal witness for the prosecution, that he was an acquaintance of Ward's and that Ward called him in the early morning hours of February 22nd asking if he could stay with Thomas. Thomas testified that Ward told him over the telephone that he was in trouble because he had killed someone. Ward and appellant were at the motel room when Thomas arrived there at about 2:00 or 2:30 a.m. on February 22nd to pick up Ward. Thomas testified that he waited in his truck and saw appellant help Ward gather his bags but that Ward took them out to Thomas' truck by himself. After they left, Ward told Thomas that he followed a girl home from a bar, forced her into a truck at gunpoint, took her out to the country, raped her and blew her brains out. Ward did not mention to his friend Thomas that appellant was involved in the offense or anything else that would explain the presence of appellant's DNA inside Mary's vagina.

Thomas eventually stopped at a store and "[g]ot the police" who arrested Ward. Detective Cheryl Johnson testified that Ward gave an audiotaped statement to the police at 7:30 a.m. on February 22nd. In this statement, Ward told the police a somewhat different story than the one he told his friend Thomas a few hours before. Ward told the police that he was drinking heavily and using cocaine on the night of the offense. He stated that he and Mary made arrangements to meet up after Fat Albert's closed. According to Ward, after Fat Albert's closed, he and appellant went back to their motel room where appellant "pretty much passed out" on the bed. Ward drove alone to Mary's apartment complex in appellant's truck and picked

Mary up.  Ward claimed that he and Mary had consensual vaginal and anal sex on the front seat of appellant's truck, and that they drove to the motel room where they had consensual vaginal sex.  Ward and Mary left the motel and drove around "a little bit."  Ward next recalled standing over Mary's body lying on the ground with a gunshot wound to her head and the gun in his hand.  Ward did not remember firing the gun.  Ward stripped Mary's body and left.  He said that he dumped Mary's clothes in a dumpster the location of which he could not recall.  He stated that he put his bloody clothes in his car at the motel.  Ward also stated that just before he moved out of the motel room on February 22nd, he left appellant a letter apologizing to him for involving him.  Ward also stated that he told Thomas a few hours before that he had sex with a girl and killed her.

*Foster*, slip op. at 2-6.

There was further testimony at trial from Detective McCaskill that, in his opinion, Mary was not shot where her body was found because there was no blood splatter in the area, which would be expected from such a close-contact wound from a large caliber handgun. Also, looking at the soles of her feet, it did not appear that she walked there. (R. 17:135-37.)  And the medical examiner testified at trial that, had Mary been shot where she was found, there would have been a "profuse" amount of blood from the wound to Mary's head at that location. (R. 18:14.) McCaskill also testified that, although it was possible that only one person could have carried the victim's body to where she was found, he was "very comfortable" with stating that two people carried her body to that location.  As support for this opinion, McCaskill pointed to the way the body was found, with the right arm up, perhaps indicating that one person carried her by her feet and one by her hands.  As further support for this opinion,

5

McCaskill testified that Mary was five-seven and 130 pounds and Ward is only approximately five-six and 140 pounds, while Foster is six-feet tall and around 225 pounds. (R. 17:136, 139-40.)

McCaskill further testified that a Whataburger cup was found no more than thirty or forty yards from Mary's body that was not faded or weathered, and Foster had told McCaskill that he and Ward frequented Whataburger. (R. 17:139, 155.) McCaskill also testified that Foster had a unique relationship with Ward, was Ward's mentor because he recruited Ward into the Army, and that they appeared to do everything together. The bartender from Fat Albert's also testified that Foster and Ward were regulars, and she could not recall ever seeing one of them without the other. (R. 17:22.)

Finally, a written statement Foster gave to the police on March 22, 2002, was admitted into evidence at the punishment, but not the guilt, phase of the trial. In this statement, Foster claimed that: he and Ward followed Mary to her apartment after meeting her at Fat Albert's; Mary voluntarily went with them to their hotel room in his truck; after taking sleeping pills and drinking beer Foster fell asleep watching television while Ward and Mary kissed; and Foster awoke to Mary performing oral sex on him. Foster further asserted in this statement that the next thing he remembered was Ward telling him that he was taking Mary home. (R. 19:95-7, 106-08.)

<u>Evidence Presented at the State Habeas Level</u>

Foster submitted several exhibits with his state habeas application. These exhibits include: 1) a post-conviction psychological evaluation report from Dr. Troy Martinez based on a personal interview with Foster, numerous psychological tests taken by Foster, interviews with Foster's mother and sister, and a review of a number of documents; 2)Foster's military records obtained by state habeas counsel in June of 2005; 3) notes from the file of Dr. Stephen Karten, the forensic psychologist hired to testify on Foster's behalf at trial; and 4) a declaration by co-defendant Sheldon Ward dated October 19, 2005, in which he states that he and Foster had consensual sex with Mary Pal in their hotel room and, if Ward indeed used Foster truck after this, Foster was asleep and unaware of this. (SHTr. I:52-140.)

<u>Evidence Presented at the Federal Level</u>

In addition to the documents submitted at the state level, Foster has submitted to this Court a letter from co-defendant Sheldon Ward to the trial-court judge, a Fort Worth police report, and an affidavit from a private investigator. In the Ward letter, dated March 13, 2006, Ward states that in August of 2005 he was diagnosed with a brain tumor in his left frontal lobe which, in the opinion of his neurologist, caused blackouts, memory loss, behavioral changes, and affected his impulse control. (Pet. Ex.:D.)

The Fort Worth police report and affidavit were submitted as exhibits to Foster's motion for discovery. The police report, dated February 18, 2002, is in actuality an inter-office memorandum addressed to Detective McCaskill. In this memo, Detective J.S. Jones recounts information he obtained that day from a woman named Jalissa Polk and her daughter, Candice Ferguson. Polk informed Jones that, on either Tuesday, February 12, 2002, or Wednesday, February 13, 2002, about 8:30 p.m., she and her nine-year-old daughter were arriving at their home in their car when Polk saw a black, four-door mini-blazer-type car parked near the driveway entrance to her apartment complex. She saw that the driver's door and the rear passenger door were open and that there appeared to be hand prints smeared on the front windshield, but she saw no one inside the vehicle. Polk further told Detective Jones that, after she was inside her apartment, she heard a gunshot, and her daughter ran inside and told her that there was a man chasing a screaming woman. Candice Ferguson told Detective Jones that she saw a black man and a black woman yelling at each other outside the car, that the woman was nude, and that the man had a gun in his hand. Ferguson further stated that she saw the man chase the woman across the street into the woods, that she later heard a gunshot, and that she then saw the man running back to the car. (Mot. for Discovery, Ex. #1). The affidavit from private investigator Roland Ray recounts a recent interview he had with Jalissa Polk and

his unsuccessful attempts to contact her daughter. (Mot. for Discovery, Ex. #2).

II

*Standard of Review*

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-3 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state

9

court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (as modified on denial of rehearing). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas-corpus petitions that, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). "Resolution on the merits" in the habeas-corpus context is a term of art that refers to the state

court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

III

*Issues Presented*

Foster alleges the following twelve grounds for relief:

A. Foster's trial attorneys provided ineffective assistance of counsel in violation of the Sixth Amendment because they failed to introduce into evidence a letter written by Foster's co-defendant which exculpated Foster in the murder;

B. Foster is actually innocent of the murder of Mary Pal;

C. Foster's trial attorneys provided ineffective assistance of counsel in violation of the Sixth Amendment because they failed to conduct an adequate investigation into potential mitigating evidence;

D. Capital punishment violates the Eight Amendment because, considering society's evolving standards of decency, it constitutes cruel and unusual punishment;

E. Lethal injection, as utilized in Texas, violates the Eighth Amendment's prohibition against cruel and unusual punishment;

F. The mitigation special issue given to the jury at punishment conflicts with the Supreme Court's decision in *Mills v. Maryland*;

G. The mitigation special issue violates the Sixth Amendment because it relieves the State of its constitutional burden to prove insufficient mitigating factors beyond a reasonable doubt;

H. The Supreme Court's holding in *Maynard v. Cartwright* requires that the term "probability of committing future criminal acts of violence," as used in a punishment special issue, be defined;

I. The Texas death-penalty scheme is unconstitutional because it limits the factors that jurors are to

11

consider when answering the mitigation special issue
at the punishment phase of a capital-murder trial;

J.     The Texas death-penalty scheme conflicts with the
       Supreme Court's decision in *Tennard v. Dretke* by
       failing to require the jury to consider mitigation
       evidence;

K.     The Texas death-penalty scheme violates the Eighth
       Amendment because the mitigation special issue sends
       mixed signals to the jury, thereby rendering any
       verdict unreliable; and

L.     The Texas death-penalty scheme is unconstitutional
       because it provides the unfettered discretion
       prohibited by the Supreme Court's decision in *Furman
       v. Georgia*.

Foster also requests an evidentiary hearing in this Court and renews

his request to depose a potential new witness. (Petition at 79).

IV

*Discussion of Claims*

Procedural Issue/Actual-Innocence claim

Initially, the State asserts that only two of Foster's twelve

grounds for relief, his third and eleventh, were exhausted at the

state level.  The State contends that Foster is procedurally barred

from raising his other ten grounds for relief.  In the case of his

second and eighth grounds for relief, the State contends that the

same legal bases for these claims were not raised at the state level.

The State further argues that Foster did not raise his first, fourth

through seventh, ninth, tenth, and twelfth grounds for relief at the

state level in any manner.  Foster does not argue with the State's

assertion that many of his claims were not exhausted at the state

level.  Instead, in his second ground for relief, Foster argues that he is actually innocent of capital murder.  Foster argues both that he is entitled to habeas relief because he is actually innocent of capital murder and that his otherwise procedurally barred claims should be considered on their merits by this Court because he has shown that, since he is actually innocent, a fundamental miscarriage of justice will occur if this Court does not consider his claims.

Procedural default occurs when a petitioner fails to exhaust all available state remedies *and* the state court to which he would be required to petition would now find that the claim is procedurally defaulted. *Bledsoe v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999). Under Article 11.071 § 5 of the Texas Code of Criminal Procedure, a habeas petitioner is prohibited from raising a claim in a subsequent habeas application unless: 1) it could not have been raised in the previous application because the factual or legal basis was unavailable at the time; or 2) the claim contains sufficient facts establishing that, but for a violation of the United States Constitution, no rational juror would have found the petitioner guilty or would have answered the punishment issues in the State's favor. *See* TEX. CODE CRIM. PROC. ANN. art 11.071 § 5(a) (Vernon Supp. 1999). The legal and factual claims presented in the grounds for relief that Foster failed to exhaust on the state level were available to him at the time he filed his state habeas application.  Moreover, Foster does not allege that his unexhausted claims contain sufficient facts

establishing that, but for a federal constitutional violation, *no* rational juror would have found him guilty or sentenced him to death. Accordingly, Foster's unexhausted claims are procedurally barred unless he can establish either cause and prejudice for the failure to raise these unexhausted claims at the state level or that the failure to consider the claims on the merits would result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722 (1991); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999). Foster alleges that he has met the requirements for the fundamental-miscarriage-of-justice exception.

In *Schlup v. Delo*, 513 U.S. 298, 327 (1995), the United States Supreme Court held that a habeas petitioner can overcome a procedural bar to reach the consideration of the merits of his constitutional claims via the fundamental-miscarriage-of-justice exception if he establishes that a constitutional violation has probably resulted in the conviction of one who is actually innocent. And, in order to prove such an actual-innocence claim, a petitioner must present new, reliable evidence not presented at trial that establishes that, more likely than not, no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *Id* at 327. Examples of such new evidence that may establish factual innocence are exculpatory scientific evidence, trustworthy eyewitness accounts, credible declarations of guilt by another, and critical physical

evidence not presented at trial. *Id.* at 324; *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999).

The evidence that Foster contends supports his actual-innocence claim includes the three confessions Ward made before and after he was arrested to his friend Duane Thomas, to Detective Johnson, and to Foster in a letter left at the motel. In addition, Foster points to the additional statement Ward made in 2005, which he has attached as an exhibit (Exhibit F), and the police report summarizing the police interviews with Jalissa Polk and her daughter.

The Court notes first that none of the three confessions Ward made at and around the time of his arrest are new evidence, and therefore they do not meet the requirements of *Schlup v. Delo*. His confessions to his friend Duane Thomas and the police detective were admitted into evidence at trial, and the note he left for Foster was referred to at trial, but not admitted into evidence. (R. 17:63). Moreover, in only one of these confessions, the note left for Foster, did Ward imply that Foster was not involved in the murder and, as will be more fully addressed later in this opinion, this letter, which contradicts other statements given by both Ward and Foster, is not persuasive evidence that Foster is innocent of capital murder. (*See infra* at 21-24). With regard to the new evidence Foster presents, Ward's signed statement dated May 22, 2005, in which he states that he and Foster had consensual sex with Mary Pal in their hotel room, that there was no kidnaping or rape, that Foster fell asleep later,

and that "if I used his truck later that morning, he was not aware of it," is not a credible declaration of guilt by another. It contradicts previous statements made by Ward in which he admitted raping Mary Pal, or maintained that the sex was consensual, but maintained that Foster was passed out during the time Ward had sex with the victim, or maintained that the sex was consensual, but claimed that Foster had sex with the victim while Foster was asleep. This statement also contradicts previous statements made by Foster in which he denied that the victim was ever in his truck, suggested that she merely leaned into his truck, admitted to riding around in his truck with Ward and Mary Pal but claimed that they dropped her off at her car at the bar where they met, or claimed that he was passed out in the motel room while the victim and Ward had sex and awoke to her performing oral sex on him. Given the numerous different stories both Foster and Ward have told to various individuals, yet another statement by Ward in which he minimizes both his and Foster's role in the crime is not a credible admission of guilt on his part.

With regard to the Fort Worth police report submitted by Foster, Foster asserts that Polk may have been a witness in this case and, as a potential eyewitness, may be able to prove that he is innocent of capital murder. But according to the report, and contrary to Foster's argument, Polk's nine-year-old daughter saw a black man--not a white man--chasing a nude black woman into the woods. Sheldon Ward, who is white, confessed to killing Mary. And this incident, as

related by Polk, occurred around 8:30 p.m. on either February 12 or February 13, 2002. The undisputed facts of this case are that the victim was seen alive at Fat Albert's bar at 2:00 a.m. on February 14, 2002, and her dead body was discovered eight hours later at 10:00 a.m. on February 14, 2002. Based on the description of the man and the date and time he was seen, whatever Polk and her daughter saw, it was not Mary Pal's assault and murder. This can be concluded without considering whether, as the State alleges, the description of the woman differs from Mary Pal's description, whether the car seen by Polk is different from either Sheldon Ward's car or Foster's truck, or whether Polk and her daughter lived anywhere near where Mary Pal's body was found. Accordingly, the police report is not persuasive evidence of Foster's innocence. Foster has not shown that the failure of this Court to address his procedurally barred claims would result in a fundamental miscarriage of justice.

Nevertheless, under 28 U.S.C. § 2254(b)(2), a federal petition for a writ of habeas corpus may be denied on its merits, notwithstanding the petitioner's failure to exhaust state-court remedies. *See* 28 U.S.C. § 2254(b)(2). Accordingly, as this Court has determined that Foster is not entitled to relief on any of his claims, this Court will address all of the unexhausted claims on their merits.

With regard to Foster's substantive claim of actual innocence, in *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court addressed a claim that a federal habeas petitioner was actually

innocent based on newly discovered evidence. The Supreme Court held that a claim of actual innocence based on newly discovered evidence does not and has never been held to be a basis for federal habeas relief absent an independent constitutional violation occurring in the state proceeding. *Id.* at 400. The Court then assumed, for the sake of argument, that in a capital case a "truly persuasive" showing of actual innocence would render the execution of an individual unconstitutional and thus warrant federal habeas relief if no state avenue existed to entertain such a claim. The Court stated that the threshold showing for such an "assumed right" would be "extraordinarily high." *Id.* at 417. The Court then concluded that conflicting affidavits, submitted eight years after a trial, when considered in light of the strong evidence presented at trial supporting guilt, did not meet this threshold. *Id.* at 417-18.

Since *Herrera* was handed down by the Supreme Court, the Fifth Circuit has specifically rejected the argument that a showing of actual innocence would warrant habeas relief if there were no state avenue open to process such a claim. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001). Accordingly, under both Supreme Court and Fifth Circuit case law, Foster is not entitled to federal habeas relief based on a claim of actual innocence.

Moreover, Texas does have an avenue in which to pursue actual-innocence claims. In *State ex. rel. Holmes v. Third Court of Appeals*,

885 S.W.2d 389, 398-99 (Tex. Crim. App. 1994), the Texas Court of Criminal Appeals held that actual innocence could be a basis for state habeas relief, provided that a petitioner establish, as a threshold, that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict. And subsequently, in *Ex parte Elizondo*, 947 S.W.2d 202, 208-09 (Tex. Crim. App. 1996), the court held that in order for a petitioner to prevail on an actual-innocence claim, he must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. Indeed, the state habeas court addressed Foster's actual-innocence claim and concluded that he had failed to meet the threshold standard set forth in *Elizondo* necessary to prove he is actually innocent. (SHTr. II:325-26).

Finally, even if this Court were to address Foster's actual-innocence claim on its merits, it fails. As noted earlier, Foster's new evidence is not "truly persuasive" evidence of innocence. The state habeas court's denial of this claim is not contrary to federal law. Foster's second ground for relief is without merit, and it is denied.

<u>Ineffective Assistance of Counsel claim--Exculpatory Evidence</u>

In his first ground for relief, Foster asserts that his trial counsel provided ineffective assistance of counsel at the guilt phase of his trial because they failed to present evidence that Foster's co-defendant left a note for Foster before he was arrested in which

he exculpated Foster of the murder of Mary Pal. Foster argues that, had this note been admitted into evidence, there is a reasonable probability that he would not have been sentenced to death. The State responds both that defense counsel did not admit the letter into evidence because it could not be authenticated and that counsel were not ineffective for failing to admit the letter into evidence because it was disingenuous and inconsistent with Sheldon Ward's other confessions.

*Applicable Law*

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). To obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Id*. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id*. at 689. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. The Court also noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

*Analysis*

After Ward was arrested, Detective Mike Carroll retrieved a letter from the motel room shared by Foster and Ward, purportedly written by Ward, in which Ward apologizes to Foster for involving him in the circumstances, and states that he drugged Foster with sleeping pills, had Mary Pal "ride" Foster while he slept in order to prove that Foster was unconscious, and then took Foster's truck. (R. 17: 169; Defense Pre-trial Ex. #1). During Foster's trial, defense counsel requested permission to question Detective Carroll

about the note during cross-examination. The trial court ruled that the defense could not introduce the content of the note without first laying the proper predicate. (R. 17:63). This note was not referred to again during Foster's trial.

Foster contends that, had defense counsel admitted this note into evidence at trial, there is a reasonable probability that the trial court would have granted defense counsel's motion for a directed verdict. In particular, Foster contends that this note would have addressed the issues raised by the State, such as the fact that Foster had claimed in a statement to Detective McCaskill that Ward had not driven his truck anytime during the week before the murder and that Foster had never acknowledged having sex with the victim, because according to the note Foster did not know that Ward took his truck and did not know that he had sex with Mary because he was asleep. In response, the State asserts that the note could not be authenticated as having been written by Ward and that, in any event, counsel were not ineffective for not placing it into evidence.

In his petition and reply, Foster makes an extensive argument that the note was admissible and could have been authenticated without having to have Sheldon Ward testify. This Court will assume that the note was admissible at trial as an admission against interest by Ward and that it could have been authenticated as having been in

Ward's handwriting.[1]  Nevertheless, Foster has failed to meet the *Strickland* standard.  Because this ground was not raised at the state level, defense counsel's affidavits do not address this issue. Accordingly, this Court does not have before it the reason why counsel did not make any further attempt to place the note into evidence. However, even without this information, Foster has failed to establish prejudice because he has not shown a reasonable probability that, had this note been in evidence at trial, either his motion for directed verdict would have been granted by the trial court or he would have been found not guilty by the jury.

As the State notes in its response, Ward's note to Foster contradicts Ward's own statement to his friend Duane Thomas, testified to by Thomas at trial, in which Ward stated that he kidnaped a girl at gunpoint from her apartment, took her out to the country and raped her, and then "blew her brains out." (R. 18:57).  In contrast, Ward's handwritten note to Foster not only implies that the sexual activity between himself and Mary was consensual, as he states that he "had Mary ride you while you slept," but also mentions being in the motel

---

[1]	Indeed, Ward has never implicated Foster in any statements he made to anyone about the crime, including the police.  And, as noted earlier, Ward has submitted a signed declaration dated May 22, 2005, in which he states that, after picking Mary Pal up from her apartment in Foster's truck, he and Foster had consensual sex with her in their motel room, after which Foster fell asleep. (Pet. Ex. F).  While this is a different version of events from what Ward told authorities and his friend Duane Thomas (and indeed different from the note left in the motel room), it again does not implicate Foster in any rape or murder. Accordingly, it is not surprising, and would be in character for Ward to leave Foster a note in which he exonerates him of any guilt and states that he hopes that law enforcement reads the note, as well.

room with the victim, something he never said to Thomas.  The
handwritten note also differs from the audiotaped statement Ward gave
to the police, in which he stated that Foster passed out at the motel,
but never mentioned Foster's being involved in any sexual activity.
But, perhaps more importantly, Ward's note contradicts the statements
Foster himself gave to the police in which he first denied that Mary
was ever in his truck, then stated that she might have leaned inside,
then stated that she was in his truck but that he and Ward returned
her to her car at Fat Albert's.  While this last statement is most
likely a lie, as the bartender reported seeing Mary leave Fat Albert's
in her own car after the bar closed, followed closely by Foster and
Ward, Foster also could not have driven Mary back to her car at the
bar if he was "passed out" in his motel room at the time Ward took
his truck and left with Mary.  Accordingly, if defense counsel had
placed this note into evidence, it would have been another statement
by a co-defendant that contradicted Foster's previous statements to
the police.

Moreover, at the punishment phase of the trial, the State placed
into evidence a written statement given to the police by Foster in
which he stated that, after taking sleeping pills and drinking beer,
he fell asleep watching television at the motel while Ward and Mary
kissed, that he awoke to Mary's performing oral sex on him, and that
he next remembered Ward's telling him that he was taking Mary home.
(R. 19:95-6).  In this version, Foster took the sleeping pills

himself, awoke enough to be aware that Mary was performing oral sex on him, and was awake when Ward was leaving with Mary, all statements that contradict the written note from Ward. While the State chose not to place this statement into evidence at the guilt phase of the trial, it was an admissible, signed, written statement from Foster that could have been admitted into evidence to contradict Ward's note, had defense counsel chosen to admit the note into evidence.

In summary, not only is the story set forth in Ward's handwritten note an incredible one, it also differs from, and in some instances directly contradicts, other statements given by both Foster and Ward that were actually admitted into evidence at trial. Because this note would constitute but another version of events given in an attempt to explain how Mary was found murdered with the semen of both Foster and Ward inside of her, Foster has failed to show that, had defense counsel admitted this note into evidence, there is a reasonable probability that either the trial judge would have granted his motion for directed verdict or the jury would have found him not guilty of capital murder. Foster's first ground for relief is without merit, and it is denied.

<u>Ineffective Assistance of Counsel claim--Mitigation Evidence</u>

In his third ground for relief, Foster asserts that his trial counsel were ineffective for failing to investigate and present mitigation evidence at the punishment phase of the trial. In particular, Foster contends that his trial counsel were ineffective

25

for failing to place his military and school records and records from his successful completion of probation into evidence and for failing to present sufficient evidence of the abuse and neglect he suffered as a child.

Foster contends that his trial attorneys were ineffective for failing to investigate, obtain, and place into evidence Foster's military and school records and failing to provide them to the defense psychologist, arguing that the military records would have demonstrated Foster's positive traits and his school records would have shown that he struggled in school. Foster further argues that counsel were ineffective for failing to investigate and present evidence of the childhood abuse Foster endured, as well as evidence of the fact that he received a positive report when he successfully completed probation for an assault conviction.

The State responds that Foster's trial counsel made strategic decisions not to obtain and present Foster's military and school records, that they were aware of the probation letter and made the strategic decision not to put it in evidence, and that they made concerted attempts to contact Foster's family members and present evidence of his upbringing. At the state habeas level, the State submitted affidavits from Foster's two trial attorneys. (SHTr. I:155-160, 167-69.) Based on these affidavits, and the record of the trial, the state habeas court, in addressing this ground, concluded that defense counsel prepared and presented a thorough mitigation case,

made decisions based on reasonable trial strategy, and were not deficient in their representation of Foster. (SHTr. II:313, 369.) This is not an unreasonable application of the *Strickland* standard.

*Applicable Law*

In *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard,* 125 S.Ct. 2456 (2005), the Supreme Court applied the *Strickland* standard in cases where the claim was made that counsel was ineffective by failing to investigate, and then present, potentially mitigating evidence. The Court in *Wiggins* determined that the appropriate question was whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was a reasonable decision. *Id.* at 522-23. Under the *Strickland* standard, a determination must be made regarding whether trial counsel used "reasonable professional judgment" to support a limited investigation into potential mitigation evidence. *Id.* This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id*. In *Wiggins*, the Court determined that trial counsel were ineffective for failing to investigate potential mitigating evidence beyond a series of tests conducted on Wiggins by a psychologist, a written pre-sentence investigation report, and records from the Department of Social Services (DSS). *Id*. at 523-24. Furthermore, the Court held that Wiggins had been prejudiced by this failure because, had counsel had

27

a social history report prepared and/or followed up on the information contained in the DSS records, counsel would have uncovered and been able to present evidence that Wiggins suffered from severe deprivation and abuse at the hands of an alcoholic mother and physical and sexual abuse during subsequent foster care, and there was a reasonable probability that the jury, confronted with this evidence, would have returned a different verdict at sentencing. *Id.* at 524-25, 534-36.

Then, in *Rompilla*, the Supreme Court held that trial counsel were ineffective for failing to examine the court's file about a prior conviction Rompilla received for rape and assault in order to prepare to represent Rompilla at the sentencing phase of his capital murder trial, as defense counsel was on notice that the State intended to present evidence of this prior conviction in its attempt to seek the death penalty against Rompilla. 125 S.Ct. at 2463-64. The Supreme Court then held that, had counsel viewed this court file, counsel would have discovered "mitigation leads" from the prison files, which indicated that Rompilla's history was very different from what Rompilla and his family had told trial counsel, including evidence of a childhood in a slum environment, a history of alcohol abuse, and previous psychological tests that pointed to schizophrenia and other disorders, as well as a low level of cognition. *Id*. at 2468. Then, had counsel pursued these leads, counsel would have discovered that Rompilla's parents were severe alcoholics, their children were neglected, Rompilla was frequently physically abused by his father,

and Rompilla suffered from organic brain damage and significantly impaired cognitive function. *Id*. at 2468-69. The Court concluded that Rompilla was prejudiced by this failure because there was a reasonable probability that he would not have been sentenced to death had the jury heard this evidence. *Id*. at 2469.

*Applicable Facts--Military Records*

With regard to Foster's military records, both of Foster's trial attorneys explained in their affidavits that they made the strategic decision not to obtain and place the records themselves into evidence at trial and not to provide them to their forensic psychologist. Further, they stated that they were concerned about the jury's seeing or hearing about some of the items that counsel believed would be found in the documents. In his affidavit, defense counsel Rex Barnett explained that he was concerned that, had the jury been shown the documents or had their psychologist relied on the documents for his opinion and been cross-examined on the issue, the jury would have learned that: 1) Foster won his Bronze Star for merit, not for valor; 2) the records did not support statements Foster had made to others about his involvement in "combat" zones; and 3) Foster had been denied the right to re-enlist and there had been court-martial proceedings against Foster. (SHTr. I:159.) Barnett also believed that the decision not to obtain the military records was strengthened by conversations defense counsel had with three potential witnesses that Foster had recommended, but counsel decided not to have testify.

These potential witnesses included two of Foster's previous commanding officers who, while they had positive things to say about Foster, also were aware of allegations that Foster had had sex with an underage female recruit and had provided alcohol to underage students he was recruiting. (SHTr. I:159.)

In his affidavit, defense counsel John Harding concurred with Barnett and added that, as someone who had served in the military himself for four years, he was very "leery" of producing Foster's personnel record because it would show any disciplinary actions taken and any criminal conduct known to his superiors, and he was very concerned about how this would affect the members of the jury with military backgrounds. Harding also stated in his affidavit that he "knew" that many of Foster's claims of secret operations would not be verified by his personnel records, and any belief by the jury that Foster was a liar would be antithetical to their defense that the charged offense was an aberration. (SHTr. I:167-68.)

Accordingly, rather than introduce Foster's military records into evidence or provide them to their forensic psychologist, defense counsel instead chose to have Foster's military record testified to by other witnesses. In particular, Donna Fagan testified that Foster recruited her son into the Army, her son was a better person because of his service, and Foster was a blessing to her and her son. She further testified that, when she was hurt on the job, Foster loaned her his truck, helped her around the house, and was a gracious and

good person. (R. 19:152-56.) Likewise, Paul Foster testified that he participated in the war in Iraq and was honorably discharged. He further testified that Foster recruited him into the Army, and Foster was always a good guy and was respectful and courteous. (R. 19:162-65.) Furthermore, Charles Samples, a childhood friend of Foster, testified that Foster served in the military (R. 20:8), and Margaret Barnes, who helped to raise Foster, testified that he received the Bronze Star for this service. (R. 20:61.) Finally, Dr. Stephen Karten, a clinical psychologist, testified about gruesome experiences Foster had related that he had had while in the military (R. 20:119-20.) He further testified that Foster had been treated at a veterans hospital for flashbacks, and he diagnosed Foster as suffering from post-traumatic stress disorder due to his experiences in the military. (R. 20:121-26.) Karten also testified that Foster did well in the structure of the military and opined that he would do well in the prison structure and would not be a future danger to society if given a life sentence. (R. 20:130-36.)

*Applicable Facts--School Records*

With regard to Foster's school records, Rex Barnett states in his affidavit that defense counsel did not consider school records showing that Foster "struggled" in school especially relevant, given the long time between his schooling and the trial, the existing testimony from family and friends, and the fact that the defense was not alleging any mental illness or defect. Barnett further notes

that it was the defense strategy to show that the offense was an aberration and that therefore Foster would not be a future danger to society--not to try to prove that Foster was a flawed or mentally defective individual. (SHTr. I:160.)

### Applicable Facts--Probation Records

With regard to Foster's assertion that his trial counsel were ineffective for failing to enter into evidence a letter requesting early release for Foster from the adult probation officer on his prior aggravated-assault conviction, Barnett also explains in his affidavit that counsel had a copy of the letter, but opted not to place it into evidence or question the State's sponsoring witness about it. Counsel determined that this might have opened the door to testimony that there had been a prior motion to revoke probation based on Foster's failure to report to his probation officer and pay fees. Instead, counsel was satisfied that the record reflected that Foster successfully completed his probation. (SHTr. I:159-60.) The record of the trial, however, reflects that this letter was placed into evidence at trial by the State, along with the motion to revoke, as part of the records in the prior assault case. (State's Ex. #67, R. 19:135.)

### Applicable Facts--Evidence of Childhood Abuse and Neglect

With regard to Foster's childhood, state habeas counsel hired a psychologist who spoke to Foster and his mother and sister, all

of whom told him of childhood abuse Foster suffered.[2]   In his evaluation, Dr. Troy Martinez states that Foster informed him that both of his parents were strict disciplinarians, who used belts and tree branches to discipline the children physically.   Foster also reported that he witnessed his father molest his brother on several occasions when the children lived with the father for a period of time.   He also informed Martinez that his father was an alcoholic, he felt helpless because he could not protect his brother, he learned later that his father had sexually abused his two sisters, and while his mother sometimes "went too far" with physical discipline, she was also physically affectionate towards her children, unlike his father.   Foster's mother and sister Donna confirmed to Martinez that Donna was molested by her father, and his mother stated that Foster told her that his father had approached him in a sexual manner, but had not forced contact. (Pet. Ex. G at 2-3.)

   According to their affidavits, Foster's attorneys contacted all family members they could locate, along with numerous friends.   In particular, defense counsel spoke to Foster's mother, her long-time companion, Margaret Barnes, Barnes's sister, Wanda Ruth, and Foster's father.   Counsel inquired about Foster's siblings and were told that one was dead and the others were "street people" who had not been

---

[2]      Foster did not submit affidavits from his mother and sister at either the state or federal level.   Instead, Foster submitted the psychological evaluation of Foster by Dr. Martinez, in which Martinez recounts his interviews of Foster's mother and sister. This evaluation has been included as an exhibit. (*See* Pet. Ex. G).

in contact with Foster's mother in several years, and whose location was unknown. Defense counsel also interviewed several people who knew Foster when he lived in Henderson, Kentucky, as a child. Counsel explains by way of affidavit that Foster's mother was not able to travel to testify because of medical problems, and several friends from his childhood were either unable or unwilling to travel to Texas or were unable to give strong testimony about Foster's positive characteristics. Foster's father was located and testified briefly at trial, but counsel did not want him to testify at length as he had a history of spousal abuse, he was a recovering alcoholic, and there had been allegations that he had sexually abused one or more of his children. (SHTr. I:157-58.). In the end, Foster's father; Margaret Barnes; Barnes's sister, Wanda Ruth; Barnes's brother-in-law, Joseph Hill; and Foster's childhood friend, Charles Samples; testified about Foster's childhood.

Cleve Foster Sr. testified that Foster is his second child and his oldest son, that Foster was ten when his parents divorced, that he took a bus to Texas from Kentucky to testify, and that he was still proud of Foster. (R. 19:146-50.) Samples testified that he has been friends with Foster since he was fourteen years old, that they met in junior high, that Foster was picked on because his eyes moved a lot, and that Foster sang in the choir. (R. 20:6-10.) Barnes testified that she helped raise Foster and first met him when he was seven years old. Barnes testified that she moved in with Foster's

mother and became a second mother to the children because Foster's mother had to work a lot of hours. Barnes further testified that Foster is kind, caring, loving, generous, and never mean; that he was popular growing up; and that he has a good sense of humor. (R. 20:47-51, 57, 65-6.) Barnes further testified that, when Foster's brother was discovered dead in his house ten years earlier, Foster entered the house later and was upset because body parts were still in the home. Foster then insisted that the body be exhumed so that all of him could be buried together. (R. 20:52-6.) Wanda Ruth testified that she met Foster when he was ten or eleven, that he was very respectful and took care of younger kids, that he gave financial assistance to his mother and Margaret when he became an adult, that he stayed with his mother when she was sick, and that he is loving, caring, and helpful. (R. 20:72-6.) Joseph Hill testified that he met Foster when he was about fifteen, Foster was respectful and was nice to Hill's children, and Foster was not a mean or rebellious teenager. (R. 20:81-3.)

Clinical psychologist Dr. Stephen Karten testified that Foster reported to him that his father was physically abusive, and that his mother drank. Foster further related to him that when his father had custody of the children for a few months before Barnes moved in with his mother and became their caretaker, the children had no clean clothing, had to fend for themselves, and were left in a car at bars when the father went inside to drink. (R. 20:115-17.) Karten also

testified that, while Foster denied that he had ever been sexually abused, he reported that the father had sexually abused his three siblings (R. 20:115, 117.)  Karten finally testified that abuse and neglect in childhood can affect physical and intellectual development, can lead to difficulties in self-control, and make one more likely to be arrested from criminal and violent behavior. (R. 20:118-19.)

*Analysis*

With regard to Foster's claim that his attorneys were ineffective for failing to place his military, school, and probation records into evidence, the record before this Court is that defense counsel made the strategic decision not to place the military and school records into evidence or provide them to the defense psychologist and made the strategic decision not to place the probation letter into evidence or question the State's witnesses about it.  His counsel have given specific reasons for this strategy.  If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of  ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *cert. denied*, 540 U.S. 11865 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002). Given the defense's stated strategy of trying to portray Foster's character as basically positive and the crime he was convicted of

as an aberration, and given the specific concerns counsel had about presenting this evidence, it cannot be said that their decision was so poorly chosen that it permeated Foster's trial with obvious unfairness. Rather, the jury heard about Foster's military career from numerous witnesses, and the jury learned that he completed his probation sentence from a previous conviction. Counsel were not ineffective in this regard.

With regard to Foster's childhood, Foster asserts that his trial attorneys did not conduct an adequate investigation into his troubled childhood. In particular, Foster contends that his trial counsel were deficient in failing to investigate this issue and obtain this information and that, had this information been presented to the jury and provided to the psychologist who testified at trial, there is a reasonable probability that he would not have been sentenced to death. The record before this Court, however, is that defense counsel investigated Foster's childhood, presented testimony from various witnesses who knew Foster when he was younger, and presented evidence of abuse and neglect through the testimony of Dr. Karten. While Foster asserts that further evidence of abuse and neglect should have been presented at trial, this evidence was garnered from Foster, his sister, and his mother. At the time of Foster's trial, his sister could not be located, his mother was too ill to travel to testify, and he himself did not testify at trial. Accordingly, Foster has not shown how this evidence could have been presented at trial.

Moreover, much of the evidence of abuse and neglect Foster points to was testified to by Dr. Karten at trial and was known by defense counsel, such as the allegations of sexual abuse by Foster's father, and the fact that Foster's father was physically abusive and drank. The only new evidence contained in Dr. Martinez's report consists of reports from Foster that his mother was a strict, physical disciplinarian, and the report from his sister Donna that she was, indeed, sexually abused by her father.

Moreover, during the punishment phase of the trial, the State presented evidence that Foster was, at the very least, present when Ward killed another woman a couple of months before the charged offense (R. 19:35-90.)[3] The State also presented evidence that Foster committed an aggravated robbery in 1984 while he was stationed at Fort Hood (R. 19:44-6), and Foster was physically abusive to his ex-wife. (R. 20:196-200.) Considering the evidence that was placed

---

[3]     In the statement he gave to Detective McCaskill on March 22, 2002, admitted into evidence at the punishment phase of the trial, Foster spoke about this previous murder.  In his version of events, he and Ward had consensual sex with Rachel Ornosky, a young woman they both had just met in the parking lot of Foster's former apartment complex, one evening in December of 2001.  Foster then recounted that, after they left her apartment and entered Foster's truck, Ward returned to the apartment for a short while.  Foster maintained in this statement did not learn that Ornosky had been shot in the head by Ward until Ward showed him a newspaper clipping about the murder sometime later. (R. 19:95-109.)  The State presented evidence calling into question Foster's version of events, including evidence that Ornosky, a recent college graduate, had moved from Lubbock to Fort Worth to work as a manager in a store at a nearby mall, had earlier that month become engaged to be married to a young man she met while in college who lived in the same apartment complex as she did, and had stopped by her fiance's apartment on the evening that she was murdered on her way to do laundry and asked his roommate if he needed any laundry done. (R. 19:49-51, 139-42.)

before the jury, Foster has not shown a reasonable probability that, had additional, similar evidence regarding Foster's childhood been testified to by Dr. Karten as the basis for his opinion, there is a reasonable probability that Foster would not have been sentenced to death. Foster's third ground for relief is without merit, and it is denied.

Capital Punishment/Death Penalty claims

In his fourth and fifth grounds for relief, Foster asserts that capital punishment in general--and the lethal-injection protocol utilized in Texas in particular--violate the Eighth Amendment. Specifically, Foster alleges that capital punishment violates the Eighth Amendment's ban on cruel and unusual punishment in light of society's evolving standards of decency and that lethal injection is a cruel and unusual form of punishment because it creates an "unnecessary and intolerable risk that the inmate will consciously suffer an excruciatingly painful and protracted death." (Petition at 58). Then, in his twelfth ground for relief, Foster asserts that Texas's death-penalty statute is unconstitutional. Specifically, Foster argues that the death penalty in general "does not work" because death-penalty statutes, like the one under which he was sentenced, provide for individualized sentencing, which creates the "unfettered discretion" forbidden by the Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972). (Reply at 28.)

In his reply brief, Foster acknowledges that relief based on his fourth and fifth grounds for relief is foreclosed by the Supreme Court's recent case *Baze v. Rees*, 128 S.Ct. 1520 (2008). In *Baze*, the Supreme Court first reaffirmed that capital punishment is a constitutional punishment. *Id*. at 1529. The Court then held that Kentucky's three-drug protocol for lethal injection is constitutional because the petitioners had not shown that the protocol creates a substantial risk of serious harm that would be reduced by the use of an alternative drug protocol. *Id*. at 1532. In the case at hand, the State asserts, and Foster does not disagree, that the drug protocol used by Kentucky and Texas is identical save for minor differences in the dosage of the second and third drugs, pancuronium bromide and potassium chloride. (Response at 75.) Moreover, as in *Baze*, while Foster has alleged that there are numerous potential problems with Texas's execution drug protocol, Foster has neither shown that Texas's drug protocol creates a substantial risk of serious harm nor has he shown that an alternative protocol would reduce any risk of serious harm. Accordingly, as the Supreme Court has recently specifically overruled the constitutional claims Foster makes in his fourth and fifth grounds for relief, these grounds are without merit and are denied.

As support for his twelfth ground for relief, alleging that the death penalty is unconstitutional, Foster cites Justice Blackmun's dissent in *Callins v. Collins*, 510 U.S. 1141 (1994). Foster argues

that this Court should declare that the death penalty as applied to him is unconstitutional because, as Justice Blackmun argued in *Callins v. Collins*, no death penalty statute can adequately follow Supreme Court precedent and both eliminate all arbitrariness from the assessment of the death penalty and provide the sentencer with sufficient discretion to consider and act upon the unique circumstances of each defendant.

Foster was indicted and tried for capital murder for killing a person during the course of committing or attempting to commit a kidnaping and for killing a person during the course of committing or attempting to commit an aggravated sexual assault, two of the subsets of murder that are eligible for the death penalty in Texas. (Tr. I:2; TEX. PEN. CODE ANN. § 19.03 (Vernon 1994)). Contrary to Foster's argument, the Supreme Court upheld a version of the Texas death-penalty statute in *Jurek v. Texas*, 428 U.S. 262 (1976), which, like the version of the statute under which Foster was tried and sentenced, narrowed the class of offenders who were subject to a death sentence to a specific subset of murder defendants. Thus, the Supreme Court has specifically ruled that the manner in which Texas narrows the class of murderers eligible for the death penalty passes constitutional muster by eliminating arbitrariness in the determination of who is eligible to received the death penalty.

Moreover, the Supreme Court stated in *Tuilaepa v. California*, 512 U.S. 967, 974 (1994) that, "[i]n providing for individualized

sentencing, it must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." And, citing *Zant v. Stephens*, 462 U.S. 862, 875 (1983), the Court in *Tuilaepa* specifically stated that a sentencer may be given unbridled discretion in determining whether to impose the death penalty once it is determined that the defendant is a member of the class that is eligible to receive the death penalty. *See Tuilaepa*, 512 U.S. at 979-980. These cases illustrate the requirement that, so long as the class of murder defendants is sufficiently tailored to avoid arbitrariness and a state provides a vehicle that is sufficient for the jury to consider all relevant punishment evidence, both aggravating and mitigating, a state capital-sentencing statute will be considered constitutional.

With respect to the special issues submitted to the jury in Foster's case, the Court notes that in *Jurek* the Supreme Court approved of the Texas future-dangerousness issue and has continued to do so in subsequent cases. *See Pulley v. Harris*, 465 U.S. 37, 50-1 (1984). And, although in *Penry v. Texas*, 429 U.S. 302, 324-5 (1989), the Supreme Court held that certain mitigating evidence could not be adequately considered within the scope of the future-dangerousness issue that the jury in Foster's trial received, Foster was tried after the Texas legislature amended Article 37.071 in order to address the Supreme Court's concerns in *Penry* and added the mitigation special issue which Foster's jury received. The Supreme Court has since

implicitly approved of the new mitigation issue as an adequate vehicle for the consideration of all mitigating evidence. *See Penry v. Texas*, 532 U.S. 782, 803 (2001) (Penry II).

Thus, through various decisions, the Supreme Court has held that the Texas statute that establishes the subset of murderers eligible for the death penalty is constitutional and that the future-dangerousness special issue is a constitutionally adequate vehicle for juries to consider aggravating and most mitigating evidence. Moreover, in *Penry II*, the Supreme Court indicated that, unlike other jury instructions and special issues, the mitigation special issue given to and answered by the jury in Foster's case is an adequate vehicle for juries to consider all mitigating evidence.

The Fifth Circuit also has held an identical claim to be without merit. *See Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005). Furthermore, the Fifth Circuit in *Hughes* held that this claim was procedurally barred under *Teague v. Lane*, 489 U.S. 288 (1989), because even if the claim were found to have merit, it would constitute a new constitutional rule of criminal procedure that would not be applicable retroactively to cases on collateral review. *Hughes*, 412 F.3d at 594; *see also Teague*, 489 U.S. at 311-13. Accordingly, Foster's twelfth ground for relief is without merit, and it is denied.

<u>Future-Dangerousness Special Issue claim</u>

In his eighth ground for relief, Foster asserts that Supreme Court precedent requires that terms used in the future-dangerousness

43

special issue be defined.  The jurors were required to answer the following special issue at the punishment phase of Foster's trial:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

The jury unanimously answered this question "yes." (Tr. II:344.) Foster alleges that the terms "probability" and "criminal acts of violence" in this special issue are unconstitutionally vague.

As support for this ground for relief, Foster cites the Supreme Court case of *Maynard v. Cartwright*, 486 U.S. 356 (1988), in which the Supreme Court reversed a death sentence, ruling that the aggravating factor that the murder was "especially heinous, atrocious, or cruel" was unconstitutionally vague.  Foster acknowledges, however, that the Fifth Circuit has consistently held that the terms used in the Texas future-dangerousness special issue are not unconstitutionally vague and can instead be understood in their common meaning. *See Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (noting the long line of Fifth Circuit cases holding that the terms in the Texas punishment special issues need not be defined in the jury instructions); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993) (not necessary to define "probability," "criminal acts of violence," or "continuing threat to society"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993) (not necessary to define "probability," or "society").  Indeed, in *Milton v. Procunier*, 744

F.2d 1091, 1095-96 (5th Cir 1984), the Fifth Circuit noted that the term "probability" has a plain meaning such that the discretion left to the jury in answering the future-dangerousness issue is no more than the discretion that exists in the jury system itself.

Moreover, as noted earlier, the Supreme Court has held that the future-dangerousness special issue that the jury in the instant case was required to answer passes constitutional muster. *See Jurek v. Texas*, 428 U.S. 262 (1976). And, while the Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 322-25 (1989), held that the future-dangerousness special issue given to the jury in Foster's case, standing alone, does not allow juries to consider adequately certain mitigating evidence such as mental retardation, that Court has never determined that the federal Constitution requires that terms used in that issue be given specific definitions. Foster raised this issue as his seventeenth point of error on direct appeal. And the court of criminal appeals, on direct appeal, citing a previous case from that court, stated that the court had previously addressed and rejected that claim, and Foster had provided no reason to revisit the issue. *Foster*, slip op. at 26; *see also Matchett v. State*, 941 S.W.2d 922, 935 (Tex. Crim. App. 1996). This conclusion is not contrary to clearly established federal law. Given the long line of Fifth Circuit precedents in opposition to Foster's claim, his eighth ground for relief is without merit, and it is denied.

## Mitigation Special Issue Claims

In his sixth, seventh, ninth, tenth, and eleventh grounds for relief, Foster alleges constitutional errors with respect to the following mitigation special issue that the jury was required to answer at the punishment phase of his trial:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and back-ground, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circum-stances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(Tr. II:344.) The jury unanimously answered this special issue "no." *Id*.

Specifically, in his sixth ground for relief, Foster contends that his constitutional rights were violated because the jury was instructed that it could not answer "yes" to this special issue unless ten or more jurors agreed on this answer, but the jury was not instructed that a hung jury would result in a life sentence. In his seventh ground for relief, Foster asserts that the Sixth Amendment right to a jury trial requires that this special issue be decided using the "beyond a reasonable doubt" standard. In his ninth ground for relief, Foster argues that the Texas death-penalty scheme is unconstitutional because it limits the definition of what constitutes mitigating evidence and, in his tenth ground for relief, Foster alleges that the Texas death-penalty scheme is also unconstitutional

46

because a capital jury is not *required* to consider mitigation evidence in reaching its decision on punishment. Finally, in his eleventh ground for relief, Foster contends that the mitigation special issue violates the Eighth Amendment because it sends mixed signals to the jury, thereby rendering any verdict on this issue unreliable. In his reply brief, Foster acknowledges that his sixth, seventh, and eleventh issues have been previously rejected by the Fifth Circuit, but states that he raised them as claims in his petition in order to preserve them for further review. (Reply at 1).

*Sixth Ground for Relief*

With regard to his sixth ground for relief, Foster alleges that his Eighth Amendment rights were violated because the jury in his case was instructed that it could not vote "yes" to the mitigation special issue unless ten or more jurors agreed with that answer or "no" if all twelve jurors agreed with that answer. (Tr. II:341.) In particular, Foster contends that, because Texas law in actuality requires that a defendant receive a life sentence if the jury hangs on the mitigation issue, the jurors who decided his case should have been instructed regarding the consequences of a jury deadlock. As support for this claim, Foster cites *Mills v. Maryland*, 486 U.S. 367, 383 (1988), a case in which the Supreme Court struck down Maryland's capital sentencing system because a single juror could preclude the jury from considering certain evidence to be mitigating and the jury

could be prevented from considering mitigating factors if the twelve jurors did not agree on what the specific facts were.

Contrary to Foster's argument, however, the Supreme Court directly addressed this issue in *Jones v. United States*, 527 U.S. 373, 381 (1999). In *Jones*, the Supreme Court addressed the question of whether a federal death-penalty defendant's Eighth Amendment rights were violated because the jurors in his case were not given a jury instruction at the punishment phase of the trial regarding the consequences of a jury deadlock. Because *Jones* was a federal death-penalty case, under the federal death-penalty statute, the jury was required to consider all aggravating and mitigating factors and determine whether the aggravating factors outweighed the mitigating factors. All aggravating factors in a federal death-penalty case must be proven beyond a reasonable doubt, whereas the jury may consider a mitigating circumstance so long as one juror finds that its existence has been established by a preponderance of the evidence. In *Jones*, the jury unanimously found the existence of two statutory and two non-statutory aggravating factors beyond a reasonable doubt and various jurors found the existence of ten mitigating factors. After weighing these factors, the jury unanimously recommended that Jones be sentenced to death. The jury did not receive an instruction requested by the defense which informed the jurors that if they were unable to reach an unanimous decision with regard to the sentence to be imposed, the judge should be informed and would then impose

a sentence of life imprisonment without possibility of parole. *Jones*, 527 U.S. at 376-80.

In *Jones* the Court held that the Eighth Amendment was not violated simply because the jury was not informed of the consequences of a deadlock on the issue of punishment. Specifically, the Court held that the federal Constitution was not violated because: 1) the jury in Jones's case was not misled about its role at punishment; 2) the object of the jury system is to secure unanimity by a dialogue among the jurors; and 3) in a capital sentencing proceeding the government has a strong interest in having the jury express the conscience of the community that might be undermined if the jury was informed about the consequences of a deadlock. *Id*. at 382. Moreover, the dissent in *Jones* did not dispute that the Eighth Amendment does not generally require that a jury be instructed as to the consequences of a failure to agree. Thus, both the majority and the dissenting opinions in *Jones* make clear that the Supreme Court does not consider it a requirement of the Eighth Amendment that a capital jury be informed of the consequences of a failure to agree with respect to its verdict at the punishment phase of the trial.

Since *Jones* was handed down by the Supreme Court, the Fifth Circuit has held that an argument that "the 12-10 rule" in Texas violated a capital murder defendant's Eighth and Fourteenth Amendments was without merit. *See Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th Cir. 2000). Moreover, the Fifth Circuit has also consistently

held that any ruling that "the 12-10 rule" violated the federal Constitution would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13 (1989), and therefore could not form the basis for federal habeas-corpus relief. *See Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir. 1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993). Accordingly, Foster's sixth ground for relief is without merit, and it is denied.

*Seventh Ground for Relief*

In his seventh ground for relief, Foster argues that his constitutional rights were violated because the State was not required to prove the absence of mitigating factors beyond a reasonable doubt. Foster cites the Supreme Court cases *Ring v. Arizona*, 536 U.S. 548 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and *Blakely v. Washington*, 542 U.S. 296 (2004); for support for his assertion that federal law requires that a Texas capital jury be required to find the absence of factors that mitigate against the death penalty beyond a reasonable doubt before answering the mitigation special issue "no" and before a defendant may be sentenced to death.

Foster argues that the mitigating special issue acts as an aggravating factor because the absence of mitigating factors aggravates his sentence from life to death, and therefore a jury must find the absence of such evidence beyond a reasonable doubt. Contrary to Foster's argument, the Fifth Circuit has specifically held that

there is no constitutional requirement that Texas's mitigation issue be assigned a burden of proof. *See Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2003). And, recently, in addressing an identical argument based on the holdings in *Ring* and *Apprendi*, the Fifth Circuit specifically held that a petitioner's Sixth Amendment rights are not violated when state law does not require the prosecution to prove the absence of mitigating factors beyond a reasonable doubt. *See Grandos v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir.), *cert. denied*, 127 S.Ct. 732 (2006). Accordingly, the Constitution does not require that the jury find beyond a reasonable doubt the absence of mitigating factors warranting a life sentence before a defendant may be sentenced to death. Foster's seventh ground for relief is without merit, and he is not entitled to relief on this basis. This claim is denied.

*Ninth and Tenth Grounds for Relief*

In his ninth ground for relief, Foster asserts that the Texas death-penalty scheme violates the Eighth Amendment because it limits the factors that jurors may consider in answering the mitigation special issue. In his tenth ground for relief, Foster argues that the Texas death-penalty scheme is unconstitutional because it does not *require* that jurors in capital cases consider mitigating evidence. For support for these grounds for relief, Foster cites *Tennard v. Dretke*, 542 U.S. 274 (2004), a case in which the Supreme Court granted a certificate of appealability to a Texas death-row inmate whose jury was not required to answer a mitigation special issue during the

sentencing phase of the trial because he was tried before the mitigation special issue was added to the Texas death-penalty statute. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071(e) (Vernon 1999). Specifically, the Supreme Court held that reasonable jurists could conclude that Tennard's evidence of impaired intellectual functioning was relevant mitigating evidence that could not be adequately considered by the jury in answering the future-dangerousness special issue. *Tennard*, 542 U.S. at 288.

As Foster notes, in reaching this decision, the Supreme Court in *Tennard* cited *Boyde v. California*, 494 U.S. 370, 377-78 (1990), in which the Court stated that the "Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence," and *Payne v. Tennessee*, 501 U.S. 808, 822 (1991), where the Court noted that "[w]e have held that a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death." *Tennard*, 542 U.S. at 286. However, contrary to Foster's assertions, neither *Tennard* nor the cases it cites supports either of his claims. *Tennard* was a case in which the jury received no mitigation special issue at all, and the Supreme Court ruled that Tennard was entitled to a certificate of appealability on his claim that, without a mitigation instruction, the jury at his trial was unable to consider his evidence of a low IQ. *Tennard* does not support Foster's contention that the definition of mitigating evidence

contained in the jury charge as being "evidence that a juror might regard as reducing the defendant's moral blameworthiness" limits the factors that jurors may consider in answering the mitigation special issue. (Tr. II:341.) Foster contends that mitigating evidence is "anything that might cause a juror to choose life over death" and, in essence, argues that the jury should have been instructed as such. (Petition at 69.) But he offers no support for his claim that the federal Constitution requires not only an appropriate vehicle for the consideration of mitigation evidence but the definition of mitigation that Foster prefers.

Likewise, the cases cited by Foster do not support his claim that a capital jury should be *required* to consider mitigation evidence in reaching its decision regarding punishment. Instead, *Tennard*, *Payne*, and *Boyde* all state that the federal Constitution requires that a capital jury be able to consider and give effect to mitigating evidence and that the State cannot preclude the jury from considering any relevant mitigating evidence--not that the constitution requires a jury to consider mitigation evidence. Foster's ninth and tenth grounds for relief are without merit, and they are denied.

*Eleventh Ground for Relief*

In his eleventh ground for relief, Foster alleges that the mitigation special issue is unconstitutional because it sends "mixed signals" to the jury. Foster cites *Penry v. Texas*, 532 U.S. 782 (2001) *(Penry II),* as support for this claim. Foster raised this

53

issue as his eighteenth point of error on direct appeal. In its opinion on direct appeal, the court of criminal appeals overruled this claim, stating that the issue had been raised and rejected before. *Foster*, slip op. at 26. This conclusion is not contrary to clearly established federal law.

*Penry II* was a case in which the defendant presented evidence of both mental retardation and severe childhood abuse, but the jury did not receive a nullification instruction. Instead, the jurors were given a "nullification" jury instruction in which they were instructed that, should they believe that Penry's mitigation evidence was such that a life, rather than a death, sentence was warranted, the jurors should change one of the answers to the existing two special issues from "yes" to "no." The Supreme Court ruled that this instruction was an inappropriate and insufficient vehicle for the jury to consider and give effect to Penry's mitigating evidence. *See id*. at 797-99.

Foster argues that the statutory mitigation special issue that his jury received is likewise constitutionally deficient because it, like the nullification instruction, sends "mixed signals" to the jury. Foster does not, however, explain what mixed signals this special issue sends to the jury. In *Penry II*, the Supreme Court was concerned with the nullification instruction because, on the one hand, the jurors were expected to answer the existing special issues truthfully but, on the other hand, were instructed to change one of those answers

if the mitigation evidence presented by Penry warranted a life sentence. The mitigation special issue here presents no such concerns. In fact, as mentioned earlier in this opinion, in *Penry II* the Supreme Court noted with approval the new mitigation special issue that recently had been added to the Texas statute. *See Penry*, 532 U.S. at 803.

While the statements by the Supreme Court regarding the mitigation special issue that the jury at Foster's trial received are dicta, they do reveal that *Penry II* does not support Foster's claim that the mitigation special issue sends "mixed signals" to the jury, as the Court referred to the "brevity and clarity" of the instruction Foster's jury received. Foster cites no other case as support for this ground. With no case law in support of this claim, it cannot be said that the state court's decision to deny this claim is contrary to well established federal law. Foster's eleventh ground for relief is without merit, and it is denied.

V.

*Requests for Discovery and Evidentiary Hearing*

Foster also requests that this Court grant him an evidentiary hearing and grant his request to depose potential witness Jalissa Polk. (Petition at 79). Under the AEDPA, except in very limited circumstances, a federal court may not grant a federal habeas petitioner a hearing in federal court if he failed to develop the factual basis for his claims in state court. *See* 28 U.S.C. §

2254(e)(2). Foster failed to raise, much less develop, many of his claims in state court.

Moreover, even if Foster had developed his factual claims in state court, or met one of the statutory exceptions, he is not necessarily entitled to a hearing in federal court. Rather, as the Fifth Circuit has explained in recent cases, in order to be entitled to an evidentiary hearing in federal court, even where, as in the instant case, no evidentiary hearing was conducted by the state habeas court, a habeas petitioner must show either a factual dispute which, if resolved in his favor, would entitle him to relief *or* in the very least a factual dispute that would require development in order to assess the claim. *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998).

In the case at hand, Foster has not shown any factual dispute that would require any further factual development in order to assess the merits of the claim. Most of his claims are legal, rather than factually based claims. And, with regard to his first three grounds for relief, which are factually based claims, this Court has accepted all of Foster's non-record evidence in considering his claims and ruled on these claims accordingly, assuming all of Foster's non-record evidence to be accurate. Foster is not entitled to a hearing, so his request for an evidentiary hearing is denied.

With regard to Foster's request to depose Jalissa Polk, as noted earlier when this Court addressed Foster's second ground for relief,

nothing in the police report submitted by Foster supports his assertion that Polk may have been a witness in this case. She, or her daughter, saw a black man, not a white man, chasing a nude black woman into the woods, but Sheldon Ward confessed to the crime, and he is white. This incident, as related by Polk, occurred during the evening of either February 12 or February 13, 2002, and the undisputed facts of this case are that the victim was seen alive at 2:00 a.m. on February 14 and found dead at 10:00 a.m. that same day. Pursuant to *Bracy v. Gramley*, 520 U.S. 899, 908-9 (1997), a federal habeas petitioner is entitled to discovery "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief," *citing Harris v. Nelson*, 394 U.S. 286, 300 (1969). Foster has not shown that, should these facts be fully developed, he would be entitled to relief. Foster's request for discovery is denied.

Cleve Foster's Petition for Writ of Habeas Corpus is DENIED. The clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED December 2, 2008.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE