IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CLEVE FOSTER, | § | |
|      *Petitioner,* | § | |
| | § | |
| V. | § | |
| | § | Civil Action No. 4:07-CV-210-Y |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | (death-penalty case) |
| Justice, Correctional | § | |
| Institutions Division, | § | |
|      *Respondent.* | § | |

**ORDER DENYING MOTION FOR RELIEF FROM JUDGMENT**
**AND CERTIFICATE OF APPEALABILITY**

Pursuant to Federal Rule of Civil Procedure 60(b), petitioner Cleve Foster has moved for relief from this Court's judgment denying his initial federal habeas-corpus petition (doc. 71). The motion relies on a recent Supreme Court opinion that affects the procedural default of habeas claims made under 28 U.S.C. § 2254. *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Rick Thaler ("the Director") opposes the motion for relief (doc. 77). Foster subsequently filed a notice with the Court conceding that his *Martinez* argument should be rejected pursuant to recent case law from the United States Court of Appeals for the Fifth Circuit and requesting a certificate of appealability (doc. 80). *See Ibarra v. Thaler*, No. 11-70031, 2012 WL 2620520 (5th Cir. June 28, 6, 2012) (not yet reported). The Court agrees *Ibarra* resolves the *Martinez* issue against Foster's position but denies the motion for additional reasons discussed below.

## I.  BACKGROUND FACTS

Foster asserts that he is innocent, that the trial evidence against him was threadbare, and that his co-actor Sheldon Ward has confessed in four different statements that he alone committed the murder and that Foster had "nothing to do with it." *Motion* at 1. Foster also argues that his ability to raise the full force of his innocence claim and related claims regarding the deficiencies of trial counsel has been thwarted by the appointment of inadequate state habeas counsel.  He contends the "ripple effect" shut down all subsequent doors in federal court, even while he has diligently pursued his rights throughout. *Motion* at 2-7.  He asserts that the State of Texas ("the State") used the failings of the system to argue that his claims of innocence "should not be investigated, provided expert assistance, nor reviewed by the federal courts." *Motion* at 9.  He contends that he has repeatedly tried to reach out to counsel and the courts to express his concern about the quality of his legal representation.  *Motion* at 11-13.  These assertions require a review of the procedural and factual background of this case.

### A.  <u>Trial</u>

In 2004, Foster was convicted and sentenced to death for the kidnaping, sexual assault, and murder of Nyanuer "Mary" Pal.  (2 CR

349-50 (judgment)).[1] The trial evidence showed that Foster committed the crime with his close friend and roommate, Sheldon Ward, and that Ward had already been convicted.[2] (17 RR 158). As such, the court's charge authorized the jury to convict Foster as either a principal actor or a party to the offense. (2 CR 309-10, 344).

The full body of guilt-phase evidence has been previously addressed by this Court in its opinion denying relief, and the Court assumes the parties' familiarity with these facts. *See Memorandum Opinion and Order Denying Petition for Writ of Habeas Corpus* at 2-5 (doc. 42) ("Opinion"). The Court will, however, revisit the various statements made by Foster and Ward because they are key to evaluating Foster's present claims.

It was the prosecution's theory at trial that Ward was the shooter, but that he was Foster's "patsy" and was aided and encouraged by Foster. (18 RR 82-87). Among its evidence at the guilt phase, the prosecution introduced Foster's recorded, oral statement to Detective McCaskill. (17 RR 127 (State's Ex. 28)("Foster's oral statement"). In the statement, Foster first denied that Pal had ever been inside his truck. Foster eventually

---

[1] "CR" refers to the two volumes of the trial court clerk's record; "RR" refers to the 24 volumes of the trial court reporter's record; "SHR" refers to the two volumes of the continuously paginated state habeas record. These references are preceded by a volume number and followed by a page number.

[2] *See Ward v. State*, No. AP-74,695 (Tex. Crim. App. May 23, 2007). In 2010, Ward apparently died from natural causes while on death row.

admitted, however, that he took Pal and Ward cruising in his truck on the night of her death but returned her to the Fat Albert's pool hall alive.   (17 RR 131-32).   The State also introduced a confession that Ward made to his friend, Duane Thomas ("the Thomas confession").   Thomas testified that he received a phone call from Ward, that he drove to the motel room that Ward shared with Foster, that Foster helped Ward gather his bags, that Ward loaded his bags into Thomas's vehicle, and that he (Thomas) drove Ward out of town. (18 RR 56-58).   During the drive, Ward confessed to Thomas that he followed a girl home from a bar, forced her into a truck[3] at gunpoint, raped her, "then drove down some old country road and stripped her down naked and blew her brains out." (18 RR 56-57). In his statement to Thomas, Ward never mentioned Foster. (17 RR 58).

It was Foster's primary argument to the jury, as it is now, that Ward acted alone.   (17 RR 10; 18 RR 87-94).   Defense counsel relied on the Thomas confession but also introduced an audiotaped statement that Ward had made to Police Detective Cheryl Johnson. (18 RR 48 (Defense Ex. 3) ("Ward's oral confession").   In his oral confession, Ward states that, after he and Foster left Fat Albert's, Foster passed out in their motel room.   Ward then used Foster's truck to pick up Pal at her apartment, after which the two

---

[3] Since Ward's own vehicle was a car, this testimony implied that the truck was Foster's.  (17 RR 122; 18 RR 57).

had consensual sex, and then he shot her.   (Defense Ex. 3).

Defense counsel also offered into evidence a letter allegedly

written by Ward and left for Foster in their motel room ("Ward's

motel letter").[4]   The prosecution challenged the authenticity of

the motel letter, and the trial court instructed defense counsel

not to discuss its contents until the predicate had been laid.  (17

RR 63).   The letter was not mentioned at trial again.

At punishment, the prosecution presented evidence that Foster

participated in a another murder that occurred in December of 2001

at the Canyons apartment complex in Fort Worth.   (19 RR 32-82).

The victim, Rachel Urnosky, was found laying on her bed with a

gunshot wound to the head.  (19 RR 36, 65).   The police recovered

---

[4] The motel letter reads as follows:

Duke,

Hey man, I'm sorry you had to be involved in this.  I fucked up & I
can't let you take the fall for this.  I drugged you the other night
with your own sleeping pills & took your truck.  Just to prove you
were out cold I had Mary ride you while you slept.  I hope nothing
bad happens to you.  My hope is that the law will see this too.  I
can't take this any longer.  I hope you don't lose your truck but if
you do take my car.  I won't be needing it where I'm going.  So long
friend you've done so much for me that I can't begin to thank you,
but well: Thank You!  PS: Take my check for all the trouble I've
caused!  Your Bro, /s/ Sheldon

To Whom it may concern,             2:30 a.m.   2/22/02

    I, Sheldon Ward, confess to the murder of Mary.  I acted alone
without any outside help or motivation.  I am truly sorry for what
I've done.  I never meant for anyone to get hurt.

                            /s/ Sheldon Aaron Ward

(3 RR 39-40 (Defendant's Pretrial Exhibit No. 1)); (17 RR 63).

a bullet from Urnosky's pillow, which came from the gun seized from Foster and Ward's motel room on February 21, 2002.  (19 RR 85).

Foster gave a written statement to police on March 22, 2002 ("Foster's written statement") in which he discusses the Urnosky murder, the Pal murder, and his mentor-like relationship with Ward. (19 RR 98-109).  In the statement, which was read to the jury, Foster described how he, a recruiter for the Army Reserves, met and recruited Ward into the Army.  (19 RR 100-01 (State's Ex. 43)). According to Foster, Ward wondered what it would be like to "cave somebody's face in" with a cannonball and expressed an "itch" to feel what it was like to kill somebody.  (19 RR 103-04).  Foster told Ward about some experiences he had as a kid involved in the KKK and also told Ward he had "crossed that line" a few times in his military career but could not talk about it because it was classified.[5]  Foster said that every time he spoke to Ward about his past, Ward seemed infatuated with the things Foster was saying. (19 RR 103).

Regarding the Urnosky murder, Foster stated that Ward was "pissed off" at his girlfriend and was "ready to go out and actually find out what it was like to take somebody's life." Foster took Ward cruising to the Canyon apartments where Foster used to live, "figuring [Ward] would lose the urge."  (19 RR 104).

---

[5]In state habeas proceedings, the prosecutor and both defense counsel agreed that Foster's military records did not support these claims of combat experience and secret operations.  (1 SHR 158-59, 168; 2 SHR 293).

At the Canyons, Foster hollered at a "little blond chick" who had gotten out of a sports car, and she waived them over. (19 RR 104). Foster described in detail how Urnosky invited them to her apartment and performed oral sex on Foster while having sexual intercourse with Ward. (19 RR 105). She eventually asked them to leave, which they did, but then Ward went back into the apartment alone, at which time Foster implies that Ward killed her. (19 RR 104-05). According to Foster, Ward later showed him a newspaper clipping of the shooting and told Foster that she was his "first one." Foster described Ward as "happily nervous." (19 RR 106).

Foster's written statement then discusses Pal, who was murdered on February 14, 2002. Foster said that he followed Pal out of the Fat Albert's parking lot to her apartment, where she got out of her car and into Foster's truck and sat between the two men. (19 RR 107). Foster describes, again in detail, how Pal went with them voluntarily to their motel room, starting "making out" with Ward, and performed oral sex on Foster while he was drowsy from having taken his prescription sleeping pills. (19 RR 108). The last thing Foster remembers about Pal was Ward saying that he would take her home, and Foster states that he was "out" (unconscious) before they even got dressed. (19 RR 107-08).

Obviously, this written statement conflicts with Foster's oral statement previously made to Detective McCaskill, in which he states he returned Pal alive to the Fat Albert's after the three

went cruising.   But, taken at face value, Foster's written statement indicates Foster knew that his recruit was infatuated with Foster's claims of having taken a human life and wanted the same experience.   Foster knew, at the time he took Pal cruising in his truck with Ward, that Ward was capable of carrying out his desire to kill, particularly under circumstances involving sexual activity with victim.   More importantly, Foster knew that Ward considered Urnosky his "first one," implying there would be more.

B.   Appeal

The Texas Court of Criminal Appeals ("TCCA") affirmed the conviction on appeal.   *See Foster v. State*, No. AP-74,901, 2006 WL 947681 (Tex. Crim. App. April 12, 2006), *cert. denied*, 549 U.S. 1118(2007).   In doing so, the TCCA upheld the legal sufficiency of the evidence to tie Foster to the abduction, sexual assault, and murder of Pal.   The TCCA wrote:

> Viewed in the light most favorable to the jury's verdict, the evidence supports a finding that, during the eight hours from when Fat Albert's closed and Mary's body was discovered, Mary was abducted from her apartment complex, sexually assaulted, murdered, and her body was moved to the location where it was found.   A jury could rationally find that [Foster] and Ward abducted Mary from her apartment complex and assaulted her.   The presence of [Foster's] DNA in Mary's vagina, the unusual manner in which [Foster] followed Mary out of Fat Albert's parking lot, and Ward's statement to Thomas that Mary was forced into [Foster's] truck support these findings.

> With regard to the murder, there is evidence of [Foster's] and Ward's "unique relationship" and the evidence that they did "practically everything together." There is also McCaskill's testimony that he was "very comfortable" with saying that two people were involved in

8

moving Mary's body to the location where it was found.
Additionally, [Foster] made several inconsistent state-
ments to the police, particularly regarding cruising with
Mary and Ward, when he initially stated she had not been
in his truck, and the assertion that they returned Mary
to her car at Fat Albert's when her car was found in her
apartment and the bartender testified that [Foster] and
Ward followed Mary from Fat Albert's.  A jury could also
infer [Foster's] consciousness of guilt from the evidence
regarding the items in the back of [Foster's] truck
soaking in bleach, which would make DNA analysis almost
impossible.   Finally, there is [Foster's] failure to
admit to having had vaginal sex with Mary in the light of
the DNA evidence establishing the presence of [Foster's]
DNA inside Mary's vagina.

On  the  record,  a  jury  could  rationally  infer
[Foster's]  involvement  in  Mary's  abduction,  sexual
assault, murder, and the disposal of her body.

*Foster*, at *5-6.

The  TCCA  also  addressed  the  factual  sufficiency  of  the

evidence,  viewing  the  evidence  in  a  neutral  light  and  focusing  on

those  facts  that  were  contrary  to  the  verdict.[6]   The  TCCA  wrote:

We also cannot conclude that the evidence contrary
to the verdict is so strong that the beyond-a-reasonable-
doubt standard could not have been met.   We initially
note  that  the  absence  of  other  forensic  evidence
connecting [Foster] to Mary's murder does not constitute
contrary evidence.   The contrary evidence in this record
primarily consists of [Foster's] denial and portions of
Ward's somewhat conflicting statements to Thomas and to
Detective  Cheryl  Johnson  taking  sole  responsibility  for
the  offense.   But  even  under  a  factual-sufficiency
analysis,  an  appellate  court  must  still  afford  "due
deference" to a jury's determinations, and a jury could

---

[6]In 2010, the TCCA determined that the factual-sufficiency review, which
required less deference to the jury's credibility and weight-of-the-evidence
determinations, had evolved into a standard that could not be meaningfully
distinguished from a *Jackson* legal-sufficiency review and discontinued its use
on appeal.   *See Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).
Nevertheless, the factual-sufficiency discussion in this case sheds light on the
state of the trial evidence and, thus, Foster's claims of innocence.

rationally conclude that the truth was "sprinkled
throughout" these statements which, considered with the
other evidence outlined above, rationally establishes
[Foster's] guilt.  In addition, the contrary evidence
actually presented to the jury at the guilt phase at
trial provides no innocent explanation about how
[Foster's] DNA came to be inside Mary's vagina.

*Foster,* at *6.

The TCCA also addressed Foster's claim that the evidence was

insufficient to support the jury's answers to the special

punishment issues, particularly, the "anti-parties" issue.[7]  The

TCCA stated:

[Foster] knew what Ward was capable of, and was with Ward
the night of Urnosky's murder and the night of Mary's
murder. [Foster] and Ward shared a motel room and were
hanging out at their usual spot, Fat Albert's, the night
they met Mary.  [Foster] and Ward left the bar in
[Foster's] truck following Mary.  [Foster] directed
police to the drawer where the gun, that was linked to
Mary's death, was found.  The police found shoes, bungee
cords and other materials soaking in cleaning fluid
inside an ice chest in [Foster's] truck.  Ward's DNA was
found on the anal and vaginal swabs and [Foster's] DNA
was found on the vaginal swab.  The evidence supports a
finding that [Foster] and Ward acted together in their
endeavors or that, at least, [Foster] should have
anticipated Ward's conduct in shooting Mary after they
sexually assaulted her.

*Foster,* at *7-8.
### C.  State Habeas Proceedings

In 2004, the trial court appointed counsel for the purpose of

filing Foster's state writ application.  (2 SHR 374).  In early

---

[7] The anti-parties issue asks, "Do you find from the evidence beyond a
reasonable doubt that the defendant actually caused the death of the deceased or
did not actually cause the death of the deceased but intended to kill the
deceased or another or anticipated that a human life would be taken?"  (2 CR
344).

2005, state habeas counsel moved for funds to hire an investigator and a mental health expert to assist in the preparation of the state habeas application.  (2 SHR 377, 380).  In June of 2005, counsel received additional funds for an investigator to (1) contact witnesses necessary to establish an alibi, if any; (2) establish the identity of the individual who was in fact responsible for committing the offense charged; (3) establish that in fact there was no offense at all; and (4) provide information for preparation of the writ.  (2 SHR 388-90).  In August of 2005, counsel again received funds to continue this investigation into Foster's innocence.  (2 SHR 396).

Counsel raised six habeas claims including a challenge to trial counsel's mitigation investigation, two challenges to the Texas death-penalty statute, two challenges to the trial court's evidentiary rulings, and a freestanding claim of actual innocence based on the assertion that Ward alone murdered Pal. (1 SHR 8-46). The innocence claim was grounded on yet another declaration made by Ward earlier that year ("Ward's 2005 declaration").[8]  Habeas counsel

---

[8]Ward's May 2005 declaration is set out below in its entirety:

I, Sheldon A. Ward, #999454, do here state that on the night of Feb 13/morning of Feb 14, 2002, left Fat Albert's with Cleve Foster in his truck and picked up Mary at her apartment.  We then went to my and Foster's hotel room where we (Mary and I, Mary and Foster) had consentual [sic] sexual intercourse.  There was no kidnapping, no rape; Foster did go to sleep sometime later, and if I used his truck later than morning he was not aware of it.  Aside from his medications we were all very drunk and he was clearly passed out.

(1 SHR 140-41).

appended to the writ application Ward's 2005 declaration, an
eleven-page report by psychologist Troy Martinez, Foster's military
records, school records, and handwritten notes from the mental-
health expert at trial. (1 SHR 48-148).

The TCCA denied relief on this claim based on the trial
court's findings and conclusions that (1) evidence in Ward's 2005
declaration that sexual relations with Pal were consensual was not
"newly discovered"; (2) Ward recently admitted having a brain tumor
that has been causing memory loss and impulse-control loss, making
his 2005 declaration "simply not credible";[9] and (3) Ward's 2005
declaration was not credible in light of its changing nature (from
prior statements) and other evidence contradicting it. (2 SHR 321,
nos. 10-13; 2 SHR 369); *Ex parte Foster*, No. 65,799-01, 2007 WL
841611 (Tex. Crim. App. March 21, 2007), *cert. denied*, 128 S. Ct.
490 (2007). In short, the state court denied the innocence claim
because Foster did not meet the state-law standard established in
*Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996)
(holding that to prevail on an actual-innocence claim unaccompanied
by a claim of constitutional error at trial, petitioner must show
by "clear and convincing evidence that no reasonable juror would
have convicted him in light of the new evidence"). (2 SHR 325-26).

---

[9] In a letter dated March 13, 2006, Ward advised the trial judge that he
was diagnosed with a brain tumor in August of 2005 that had been there for many
years, causing "blackouts, memory loss, behavioral changes and affecting [his]
impulse control." (2 SHR 290).

D.  Federal Habeas Claims

In 2008, Foster filed his federal habeas application in this Court, raising the following relevant claims: (1) an unexhausted ineffective-assistance-of-trial-counsel claim (claim 1) based on counsel's failure to get Ward's motel letter admitted, and (2) actual innocence (claim 2), both as a freestanding claim under *Herrera v. Collins*, 506 U.S. 390 (1993), and as a gateway claim under *Schlup v. Delo*, 513 U.S. 298 (1995) to excuse the procedural bar asserted by the Director against his unexhausted claims. Foster also argued that state habeas counsel was ineffective for failing to exhaust claim 1. *Petitioner's Reply* at 5-6. This Court denied the application its opinion dated December 2, 2008 (the "Opinion").

The Court found that Foster's "gateway" innocence claim was based on evidence that was either not newly discovered (i.e., Ward's confession to Thomas, Ward's oral confession to Detective Johnson, and Ward's motel letter) or not persuasive and credible evidence of innocence (i.e., Ward's 2005 declaration and a police report made about an unrelated abduction). Specifically regarding the 2005 declaration, the Court held that, "Given the numerous different stories both Foster and Ward have told . . . yet another statement by Ward in which he minimizes both his and Foster's role in the crime is not a credible admission of guilt on his part." *Opinion* at 16. Therefore, this Court concluded that Foster did not

show that the failure to address his procedurally barred claims would result in a fundamental miscarriage of justice. *Opinion* at 17. The Court also held that Foster's freestanding actual-innocence claim was not cognizable in federal habeas proceedings, that there is an avenue for such claims under Texas law which Foster had pursued, and that the state court's rejection of Foster's actual-innocence claim was not contrary to federal law. *Opinion* at 18-19. The Court concluded that, even if it were to address Foster's freestanding *Herrera* claim on the merits, it would fail because Foster's new evidence was not truly persuasive evidence of innocence. *Opinion* at 19.

This Court then addressed the merits of Foster's procedurally barred claim that counsel was ineffective for failing to introduce Ward's motel letter. This Court assumed, to Foster's benefit, that the letter could have been authenticated as Ward's handiwork and was admissible, but rejected the ineffective-assistance claim because Foster did not show prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). *Opinion* at 22-25. This Court concluded that the story set forth in the motel letter was itself incredible, but also differed from or contradicted other statements given by both Foster and Ward, such that no prejudice was shown. *Opinion* at 25.

14

E.   Subsequent Proceedings and *Martinez v. Ryan*

The Fifth Circuit denied Foster's application for a certificate of appealability, and the Supreme Court denied certiorari. *Foster v. Thaler*, 369 F. App'x 598(5th Cir.), *cert. denied*, 131 S. Ct. 822 (2010). An execution date was set for January 11, 2010, and Foster sought funds to hire a blood-spatter expert to present an innocence claim before the Texas Board of Pardons and Paroles.  This Court, as well as the Fifth Circuit, denied his requests for funds.

As set out in two orders, this Court declined to grant funds for gathering additional expert testimony to support a claim of innocence in clemency proceedings when that claim had been previously litigated and rejected in both state and federal court. This Court also concluded that Foster's innocence theory based on blood-spatter around the body was unsound because such evidence had no logical bearing on the identity of persons involved in Pal's murder and did not undermine the other evidence connecting Foster to the crime.  Finally, this Court observed that trial testimony unchallenged by Foster indicated that the large-caliber wound to the victim's head would have left a profuse amount of blood and possibly brain matter in the area where she was shot, that expert testimony was not needed to review the crime scene photographs in this regard, and that Foster's expert, in any event, did not see profuse amounts of blood or brain matter near the body. *See Order*

15

on Motion to Reconsider Amended Motion for Funds to Prepare State
Clemency Petition (doc. 65); Order on Amended Motion for Funds to
Prepare State Clemency Petition (doc. 63); see also Order, No. 10-
70032(5th Cir. Dec. 17, 2010) (order denying funding).

In a subsequent state writ application, Foster raised a new
claim of ineffective assistance of trial counsel for failing to
hire a blood-spatter expert.  The TCCA dismissed this application
as an abuse of the writ.  Ex parte Foster, No. 65,799-02, 2010 WL
5600129 (Tex.  Crim. App. Dec. 30, 2010).  Foster petitioned for
certiorari and the Supreme Court granted a stay on January 11,
2011, but then denied the petition a week later.  See Foster v.
Texas, 131 S. Ct. 991 (Jan. 11, 2011); Foster v. Texas, 131 S. Ct.
1034 (Jan. 18, 2011).  Another execution date was set for April 5,
2011, but on that day, the Supreme Court stayed the execution
pending the disposition of a motion for rehearing.  Foster v.
Texas, 131 S. Ct. 1848 (April 5, 2011).  The Supreme Court denied
rehearing the following month.  See Foster v. Texas, 131 S. Ct.
2951 (May 31, 2011).

A third execution date was set for September 20, 2011.  Foster
filed a second subsequent writ application in state court, seeking
a stay until the Supreme Court decided Martinez v. Ryan, but the
TCCA denied it as an abuse of the writ.  Ex parte Foster, No.
65,799-03, 2011 WL 4071983 (Tex. Crim. App. Sept. 12, 2011).  The

16

Supreme Court granted another stay of execution, however. *Foster v. Texas*, 132 S. Ct. 69 (Sept. 20, 2011).

The Supreme Court issued its opinion in *Martinez* on March 20, 2012. Generally speaking, it held that for claims of ineffective assistance of trial counsel, the ineffective assistance of initial state habeas counsel may establish cause to excuse procedural default. *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Six days after issuing *Martinez*, the Supreme Court again denied certiorari in this case. *Foster v. Texas*, 132 S. Ct. 1821 (Mar. 26, 2012). Another execution date is presently set for September 25, 2012.

## II. DISCUSSION

Foster contends that this Court should reopen the case to consider the application of *Martinez* to his claims. The motion is vague as to which specific claims Foster seeks to relitigate, but it focuses on two general issues: (1) innocence (claim 2) and (2) the ineffective assistance of trial counsel "for failing to fully litigate the question of his innocence." *Motion* at 4. This latter claim appears to include (a) counsel's failure to get Ward's motel letter admitted into evidence (claim 1); (b) new, unspecified evidence consisting of "three additional witnesses [who] have come forward recounting additional declarations Sheldon Ward made before his death, pronouncing, without equivocation, Mr. Foster's innocence"; and (c) trial counsel's failure to hire a blood spatter

17

expert, supported by a 2011 affidavit from trial counsel. *Motion at 9* and Appendix 4.

The Director argues that Foster's claim challenging trial counsel's failure to hire a blood-spatter expert is a successive habeas claim that first must be presented to the Fifth Circuit and is also time barred. *See* 28 U.S.C. §§ 2244(b)(3)(A) and 2244(d). He argues that *Martinez* does not apply in Texas but if it does, Foster's state-habeas attorney was not ineffective. Finally, the Director argues that Foster's underlying ineffective-assistance-of-trial-counsel claims lack merit because Foster has not shown that the blood-spatter expert was available to testify or that his testimony would have undermined confidence in the verdict, and any statements by Ward purporting to exonerate Foster have already been rejected as a basis for relief. *Response* at 21-46.

## A. Jurisdiction Under Rule 60(b)

A district court has jurisdiction to consider a rule 60(b) motion in habeas proceedings so long as the motion "attacks, not the substance of the federal court's resolution of the claim on the merits, but some defect in the integrity of the federal habeas proceedings." *See Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005). A motion that seeks to add a new ground for relief or attack the previous resolution of a claim "on the merits" is in substance a successive habeas petition and should be treated accordingly under the AEDPA statute. *Id.* at 531-32. A petitioner does not make a

habeas claim, however, when he merely challenges a previous ruling which precluded a merits determination, such as a denial based on procedural default. *See Adams v. Thaler*, 679 F.3d 312, 319 (5th Cir.), *cert. denied*, 132 S. Ct. 1995 (2012).

Here, only one claim identified in Foster's motion was actually raised in his initial federal petition and found by this Court to be procedurally barred:  the claim that trial counsel was ineffective for failing to get the motel letter admitted into evidence.  The innocence claim (contrary to Foster's assertions) was exhausted in state habeas court and addressed on the merits by this Court in 2008.  *Motion* at 4.  The innocence claim is, therefore, DISMISSED under 28 U.S.C. § 2244(b)(1) (requiring dismissal of a second or successive claim that was presented in a prior application).

The remaining ineffective-assistance claims regarding the blood-spatter expert and three unnamed hearsay witnesses are, in substance, new successive habeas claims.  As such, these matters are not properly before this Court.  *See Rocha v. Thaler*, 619 F.3d 387, 399 n.26 (5th Cir. 2010) (noting that where Rule 60(b) motion contains a new claim, it is properly considered a successive habeas petition, subject to AEDPA's requirement that it be precertified by the court of appeals).  These claims are DISMISSED under 28 U.S.C. § 2244(b)(2), (3).

B.   <u>Relief Under Rule 60(b)(6)</u>

This Court has jurisdiction to reopen Foster's remaining claim alleging counsel was ineffective for failing to get the motel letter admitted at trial. *See Williams v. Thaler*, 602 F.3d 291, 305 (5th Cir. 2010). Rule 60(b)(6) allows a party to seek relief from a final judgment for any reason other than the five circumstances enumerated in rules 60(b)(1) through (5). *See Gonzalez*, 545 U.S. at 529-30; *Rocha*, 619 F.3d at 400. A "grand reservoir of equitable power to do justice," the rule is only invoked in "extraordinary circumstances" justifying the reopening of a final judgment. *See Gonzalez*, 545 U.S. at 535; *Rocha*, 619 F.3d at 400. "Such circumstances will rarely occur in the habeas context." *Gonzalez*, 545 U.S. at 535.

In *Adams*, the Fifth Circuit concluded that the *Martinez* decision "is simply a change in decisional law and is not the kind of extraordinary circumstance that warrants relief under Rule 60(b)(6)." *Adams*, 679 F.3d at 320. Foster attempts to distinguish this case from *Adams* because he has diligently pursued his appeals and asserted deficiencies of his counsel, and because his claims are not record-based, but rely on new evidence. *Motion* at p. 16. *Adams* is not a fact-based decision, however. The Fifth Circuit panel observed that Adams's habeas claims had been properly dismissed under the then-controlling precedent of *Coleman v. Thompson*, 501 U.S. 722 (1991) and that *Martinez's* narrow exception

20

to *Coleman* regarding cause to excuse procedural default did not constitute an extraordinary circumstance under the Supreme Court's opinion in *Gonzalez*. Likewise, this Court held that Foster's claim was procedurally barred under *Coleman*. *Opinion* at 12-17. Accordingly, *Martinez* is not a justification for reopening the judgment in this case under rule 60(b)(6).

### C. *Martinez* Would Not Alter the Court's Conclusions

Alternatively, even if this Court were to reopen the judgment, *Martinez* would not alter the Court's conclusions as to procedural default. Notably, Foster makes no argument as to the possible application of *Martinez*; rather, he asks to present this argument at some future time. *Motion* at 25.

### 1. *Martinez* Does Not Apply in Texas

The rule in *Martinez* has been narrowly drawn. *Martinez* allows the ineffectiveness of state-habeas counsel to excuse the default of claims regarding ineffective trial counsel only in states where the trial-counsel claims must be raised in an "initial-review collateral proceeding." *Martinez*, 132 S. Ct. at 1320. Furthermore, the underlying ineffective-assistance-of-trial-counsel claim must be substantial, "which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 1318.

21

Unlike the Arizona law at issue in *Martinez*, Texas law does not require ineffective-assistance-of-trial-counsel claims to be raised in initial state-habeas proceedings. As Foster concedes in his Notice, *Martinez* therefore does not change the procedural default analysis in this case. *See Ibarra*, 2012 WL 2620520, *4 (holding that death-sentenced petitioner was not entitled to the benefit of *Martinez* for his ineffectiveness claims because Texas procedures entitled him to review through counseled motions for new trial and direct appeal); *see also Gates v. Thaler*, No. 11-70023, 2012 WL 2305855, (5th Cir. June 19, 2012) (per curiam) (unreported) (holding that *Martinez* does not alter the cause-and-prejudice analysis in Texas capital case); *Adams*, 679 F.3d at 317 n.4 (noting that ineffective-assistance claims are often brought on direct appeal in Texas, with mixed success).

## 2. The Underlying Claims of Ineffective Counsel Lack Merit

Even if *Martinez* applies in Texas, this Court cannot conclude that Foster's claims of ineffective assistance by trial counsel have "some merit," as required in *Martinez*. To prevail on his ineffective-assistance claim, Foster would need to demonstrate that (1) trial counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that prejudice sufficient to undermine confidence in the trial outcome resulted from the deficiency. *See Bower v. Quarterman*, 497 F.3d

459, 466 (5th Cir. 2007) (citing *See Strickland v. Washington*, 466 U.S. 668, 686, 694 (1984).

### a.  Ward's Motel letter

In the motel letter left for Foster, Ward admitted to drugging Foster with Foster's own sleeping pills, having "Mary ride you while you slept," and "t[aking] your truck" all while Foster was passed out.  (3 RR 39-40 (Defendant's Pretrial Ex. 1)).  Thus, the letter arguably explained the presence of Foster's semen in Pal's vagina and tended to show that he was passed out at the time of her murder.

This Court found in 2008 that Foster's claim regarding the motel letter was procedurally barred, but it also rejected the claim on the merits.  This Court assumed that the motel letter could be authenticated and admitted at trial, but found that the story in the letter was not credible and that the letter contradicted Ward's confession to Thomas, Ward's confession to Detective Johnson, Foster's oral statement to McCaskill, and Foster's written statement (admitted at the punishment phase), such that no *Strickland* prejudice was shown.  *Opinion* at 23-25.

Foster argues, however, that this Court's assessment of the merits of his claim was incomplete due to a "truncated record." *Motion* at 16, 24.  Foster elaborates that an incomplete record hindered his ability to persuade this Court why Ward's motel letter was a "pivotal" piece of exculpatory evidence and why it provided

23

"facts and explanations not present in Ward's other statements
exonerating Foster." *Motion* at 24. But Foster fails to identify
what, exactly, is missing from this record that would change this
Court's assessment of his claim.

Foster also emphasizes that, although Ward's statements
contain inconsistencies, they are "unremittingly consistent in
making clear that Ward alone murdered Pal." *Motion* at 1. The
Court disagrees. Ward's first confession to his friend Thomas
could be interpreted to imply that Foster was a participant in the
murder. This is because Ward never mentions taking Foster home
after they left Fat Albert's together in Foster's truck, which was
then used to abduct Pal from her apartment. (18 RR 57). Ward's
statements also conflict with each other in serious details, such
as whether Ward's sex with the victim was consensual and whether
Foster had sex with the victim at all. Moreover, in Ward's
subsequent 2005 declaration, he effectively retracts his prior
admissions of guilt and states simply that he and Foster had
consensual sex with Pal in their motel room, that there was no
kidnaping or rape, and that Foster fell asleep later, and that "if
I used his truck later that morning, he was not aware of it." (1
SHR 140-41). Ward's motel letter also contradicted *Foster's* oral
statement to Detective McCaskill that, after cruising around, he
(Foster) drove Pal in his truck back to Fat Albert's. For,
according to Ward' letter, at that time Foster was drugged and "out

24

cold." *Opinion* at p. 24; (17 RR 132 (State' Ex. 28)).  Ward's statements are not "unremittingly consistent" with anything.

Foster also fails to address the inherent problems with Ward's credibility given the unusual relationship between the two men and Ward's brain tumor.  Ward's statements attempting to exonerate Foster, such as they are, correspond with his role as the "patsy," who was manipulated with false tales of combat by his recruiter. This Court has observed previously that it would be in keeping with Ward's character to leave a letter for Foster in the motel room exonerating Foster of any guilt and stating that he hopes law enforcement reads the note as well. *Opinion* at 23, n.1.  Moreover, Ward suffered from a brain tumor which, according to Ward, was diagnosed in August of 2005 and had been present for many years prior to that. (2 SHR 290-91).  The tumor, which caused blackouts, memory loss, and changes in impulse control, undermined Ward's credibility in the eyes of the state habeas court. (2 SHR 321).

In sum, the jury heard Ward's confessions to his friend Thomas and to Detective Johnson, arguably the more believable of his four statements given their circumstances and timing.  The jury never-theless rejected the theory that Ward acted alone.  Ward's story in the motel letter is not a believable one, it conflicts with other evidence, and it is hampered by Ward's credibility issues.  This Court's remains confident in the trial outcome despite the fact that the jury did not also consider Ward's motel letter.  The Court

concludes, as it did in 2008, that Foster has not shown *Strickland* prejudice.  The Court further finds that to the extent Foster has suggested he possesses additional statements made by Ward before his death to three unidentified persons, those hearsay statements will meet with the same credibility problems.  *Motion* at 10.

b.  Blood-spatter Expert

Foster also contends trial counsel was ineffective for failing to hire a blood spatter expert.  *Motion* at 8.  He supports this claim with a 2011 affidavit from trial counsel stating that he "never considered the issue as to where the victim was shot to be an important issue."  Appendix 4.[10]  Assuming for purposes of argument that an expert had been available and would have testified that blood spatter at the scene indicated the victim was shot where she was found, there is no prejudice.  As addressed previously by this Court, the lead detective in the investigation agreed under cross-examination that his opinion about where Pal was killed was based on speculation; thus, the jury knew the weakness in the prosecution's theory.  (17 RR 156-67); *Order on Motion to Reconsider Amended Motion for Funds to Prepare State Clemency Petition* (doc. 65).  And, although the prosecution maintained this theory about how the crime was committed, it was not essential to

_____

[10]Trial counsel's affidavit states in its entirety: "I never considered the issue as to where the victim was shot to be an important issue.  Thus, I never investigated nor considered consulting with a blood spatter expert to review the State's theory that the victim was shot in the same location in which she was later recovered.  Signed on this the 11th day of January, 2011. /s/ Rex Barnett."

26

the prosecution's case to prove that Pal was shot elsewhere. Foster's blood-spatter expert would only have provided a different way in which Foster and Ward committed the crime, e.g., by carrying Pal alive into the woods and shooting her there.

Thus, contrary to showing counsel was ineffective, trial counsel's 2011 affidavit confirms this Court's assessment of the trial evidence in the case and the insignificance of Foster's blood-spatter reports. The blood spatter has no logical relation to the identity of Pal's murderer or any element of the murder, and its absence at the guilt phase, even when considered in conjunction with the absence of Ward's motel letter, does not undermine this Court's confidence in the verdict.

### c. Conclusion

Foster has asserted that the judiciary system failed him by appointing inadequate trial and habeas counsel and that he has repeatedly raised his concerns about the quality of his legal representation to no avail. He asserts that the State capitalized on his counsels' failures by arguing that his claims of innocence and ineffectiveness "should not be investigated, provided expert assistance, nor reviewed by the federal courts." This is a misrepresentation of the history of this case.

The theory that Ward acted alone is not new; it was Foster's defense at trial, and the jury deliberated on Ward's confessions to Thomas and Detective Johnson. The legal and factual sufficiency of

the evidence was raised and addressed on direct appeal. State habeas counsel received funding to investigate and present the innocence claim to the state court, along with Ward's 2005 declaration. The innocence claim and the related ineffective-assistance claims were also considered on the merits by this Court on habeas review and again upon Foster's motion for clemency funding. This Court has considered the additional post-conviction evidence developed by Foster and, although he claims the record is still incomplete, he does not say how. Neither the motel letter nor the blood spatter testimony nor Ward's 2005 declaration (which essentially retracts Ward's prior admissions of guilt) diminishes the evidence that tends to show that Foster recruited Ward as a killer of the women that they raped, Urnosky being the first and Pal being the second. In the end, Foster's claims appear to be based on nothing more than his own dissatisfaction with the outcome of the case. The Court denies the motion to reopen the judgment.

### III.   CERTIFICATE OF APPEALABILITY

Considering the record in this case, and pursuant to Fed. R. App. P. 22(b), Rule 11(a)of the Rules Governing Section 2254 Cases in the United States District Courts, and 28 U.S.C. § 2253(c), the Court denies a certificate of appealability. The Court concludes that Foster has failed to show (1) that reasonable jurists would find this Court's "assessment of the constitutional claims debatable or wrong," or (2) that reasonable jurists would find "it

debatable whether the petition states a valid claim of the denial

of a constitutional right" and "debatable whether [this Court] was

correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S.

473, 484 (2000). If Foster files a notice of appeal, his *in forma*

*pauperis* status will continue on appeal.

      SIGNED August 13, 2012.

                                           TERRY R. MEANS
                                         UNITED STATES DISTRICT JUDGE

TRM/ks:be